EDGAR A. BASSE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CARRIE HARTZ BASSE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3370, 3371. Promulgated February 19, 1948.

*A. N. Moursund, Esq., James H. Yeatman, Esq., Gilbert M. Denman, Esq.,* and *Ben F. Irby, C. P. A.,* for the petitioners.
*John W. Alexander, Esq.,* for the respondent.

334

OPINION.

TURNER, *Judge*: The history of section 22 (d) of the Internal Revenue Code,[1] which authorizes the use of the lifo method, and the effect of the use of that method were considered by us at length in *Hutzler Brothers Co.*, 8 T. C. 14. We pointed out there that the use of the method was originally limited to taxpayers engaged in certain types of business, but that the Revenue Act of 1939 made the method available to all taxpayers, regardless of the type of business in which they are engaged. As was indicated in that case, it is common in a period of rising prices that the same number of dollars will represent a smaller quantity of goods or that the same quantity of goods will be represented by a greater number of dollars. The lifo method makes the assumption that for a given year the latest purchases were the first sold and that the earlier purchases remained on hand at the end of the year, without regard to whether the actual physical content of the inventory conforms to the assumptions so made. Because of such assumptions, the primary problem presented by the method is the reduction of the closing inventory to terms of cost of the earlier purchases.

The petitioners contend that the procedures employed by them correctly effect such reduction respecting their 1941 closing inventory of merchandise in the warehouse and in the stores, exclusive of that

---

[1] SEC. 22. GROSS INCOME.

\* \* \* \* \* \* \*

(d) METHOD USED IN INVENTORYING GOODS.—

(1) A taxpayer may use the following method (whether or not such method has been prescribed under subsection (c)) in inventorying goods specified in the application required under paragraph (2) :

(A) Inventory them at cost;

(B) Treat those remaining on hand at the close of the taxable year as being: First, those included in the opening inventory of the taxable year (in the order of acquisition) to the extent thereof, and second, those acquired in the taxable year; and

(C) Treat those included in the opening inventory of the taxable year in which such method is first used as having been acquired at the same time and determine their cost by the average cost method.

(2) The method described in paragraph (1) may be used—

(A) Only in inventorying goods (required under subsection (c) to be inventoried) specified in an application to use such method filed at such time and in such manner as the Commissioner may prescribe ; and

(B) Only if the taxpayer establishes to the satisfaction of the Commissioner that the taxpayer has used no procedure other than that specified in subparagraphs (B) and (C) of paragraph (1) in inventorying (to ascertain income, profit, or loss, for credit purposes, or for the purpose of reports to shareholders, partners, or other proprietors, or to beneficiaries) such goods for any period beginning with or during the first taxable year for which the method described in paragraph (1) is to be used.

(3) The change to, and the use of, such method shall be in accordance with such regulations as the Commissioner, with the approval of the Secretary, may prescribe as necessary in order that the use of such method may clearly reflect income.

(4) In determining income for the taxable year preceding the taxable year for which such method is first used, the closing inventory of such preceding year of the goods specified in such application shall be at cost.

in the meat departments of the latter. The respondent, on the other hand, contends that both section 22 (d) and his regulations relating thereto require the matching of particular articles of goods on hand at the close of the year with the articles of goods on hand at the beginning of the year and those acquired during the year; that, in arriving at their 1941 closing inventory of merchandise in the warehouse and in the stores, the petitioners have not made such matching; and that their failure to do so is fatal to their claim. He further urges that section 22 (d) affords no basis for the use of a "dollar value method" in ascertaining inventory value.

In arriving at the 1941 closing inventory value of the merchandise in the warehouse used by them in their returns, the petitioners took an actual physical inventory of all items of such merchandise, priced at both December 31, 1941, and December 31, 1940, costs. Where the closing inventory of a classification priced at December 31, 1940, cost was not in excess of the opening inventory of that classification, the closing inventory priced at December 31, 1940, cost was used by petitioners in their returns as the closing inventory of that classification.

Where the closing inventory of a classification priced at December 31, 1940, cost was in excess of the opening inventory of that classification, the petitioners used two amounts to arrive at the closing inventory reported by them for such classification. The first amount was an amount equal to that of the opening inventory for that classification. Thus in effect they treated, as having been in the opening inventory, dollar value of the closing inventory to the extent of the amount of the opening inventory. The other amount used by petitioners was arrived at as follows: The amount of the excess of the closing inventory, priced at December 31, 1940, cost, over the opening inventory was first determined. This excess amount was increased by the percentage of increased cost for the classification during the year. The amount thus obtained was added to the amount equal to the opening inventory, thus giving the amount used by petitioners in their returns as the closing inventory for such classification. The percentage of increased cost for the classification during the year was arrived at by comparing the December 31, 1940, cost with the December 31, 1941, cost of the classification, the comparison being made on a dollar basis, without regard to whether the closing inventory contained the same items as were contained in the opening inventory and without regard to whether the increased value was primarily due to one or more items in the classification.

The method used by the petitioners in arriving at the 1941 closing inventory value in classifications where the closing inventory exceeded the opening inventory requires a determination of two questions, namely, (1) whether for purposes of valuing the increase in inventory a dollar amount of the closing inventory equivalent to the amount

of the opening inventory is, under the lifo method, to be regarded as having been on hand in the opening inventory, and (2) whether the excess inventory is to be valued by increasing it by the percentage of increased cost for the classification during the year. A determination of these questions requires consideration of respondent's contentions respecting the use of the "dollar value method" in valuing inventories and the matching of particular articles of goods on hand at the close of the year with the same particular articles on hand at the beginning of the year.

In *Hutzler Brothers Co.*, *supra*, we had occasion to consider the use of the "dollar value method" and the question of the matching of particular articles of goods in determining inventory value of goods in the various departments of a department store. There the taxpayer formerly had taken its inventories on the basis of the retail method, but for the taxable year involved it had elected to use the lifo method for valuing its inventory. We there held that under the lifo method a physical matching of goods on hand in a given department at the end of the year with goods on hand in that department at the beginning of the year was not required and that a matching of dollar values of a department at the beginning and end of the year was sufficient to constitute compliance with the matching requirements of the statute. That holding was reached although admittedly the goods on hand at the beginning and end of the year generally differed considerably as to type, quality, and price. In view of our holding in that case, and finding nothing in the instant case to warrant a contrary conclusion, we hold that, for the purposes of valuing the increase in inventory in the classifications in which an increase occurred, a dollar amount of the closing inventory equivalent to the amount of the opening inventory is to be treated as having been on hand in the opening inventory.

Where the 1941 closing inventory of a classification computed at December 31, 1940, cost was in excess of the opening inventory, such excess, under the lifo method, is to be treated as goods acquired during 1941. *Hutzler Brothers Co.*, *supra*. The regulations of the respondent provide that the cost at which such excess is to be included may be computed on the basis either of (a) the latest costs, (b) the earliest costs, or (c) the average costs for the year. Sec. 19.22 (d)-2, Regulations 103; sec. 29.22 (d)-2, Regulations 111. The method employed by the petitioners in computing the amount at which the excess was included in the closing inventory for 1941 was in effect a computation on the basis of the latest costs of the year.

We have held above that, in valuing the inventory of classifications in which an increase in inventory occurred, a dollar amount of the closing inventory equivalent to the amount of the opening inventory is to be treated as having been on hand in the opening inventory.

In conformity with that holding, we conclude that, in classifications where there was no increase in inventory, a dollar amount of the closing inventory is to be treated as having been on hand in the opening inventory.

In view of the foregoing, we conclude that the method employed by the petitioners in arriving at the 1941 closing inventory of goods in the warehouse is permissible under the provisions of section 22 (d), *supra.*

In the case of the retail stores, the petitioners took inventory by the retail method, disclosing a dollar value for the closing inventory at cost of $148,645.10. The respondent not only does not take issue with this result, but has stipulated that $148,645.10 is the amount of the closing inventory in the retail stores at cost. He does not agree, however, that petitioners have shown the cost of such goods at the beginning of the year. That the petitioners have failed in their showing in that respect, may not correctly be denied by the petitioners. They have assumed that the factor of 113.70, which is the composite factor showing the beginning of the year costs for the goods which were in the warehouse at the end of the year in the dollar value quantities in the respective twenty-seven departments or classifications, is likewise indicative of the cost of the goods contained in the closing inventory of the retail stores at beginning of the year prices, even though the stores inventory was taken as a unit and not according to classifications. The evidence of record discloses the error in such an assumption, and there is no way of knowing, on the record before us, whether a computation with respect to the inventory of the retail stores using that factor will give a result which even closely approximates a correct or substantially correct result. The petitioners have arrived at the factor used by dividing the warehouse inventory into twenty-seven different departments or classifications and by determining the dollar quantity of goods in each classification at both the end of the year and the beginning of the year, giving effect to the percentage of increase in each particular classification to the dollar inventory of that classification. In that connection it is to be noted the percentages of increase in the respective classifications ranged all the way from minus 2.13 for the canned syrups classification to plus 43.64 for dried fruits. In the case of the retail stores, there is no showing whatever with respect to the dollars in the closing inventory to which are to be applied the minus 2.13 factor, or the dollars of closing inventory to which the plus 43.64 factor is applicable, and, since the 113.70 over-all or composite factor for warehouse goods is bottomed on such facts, its application to the retail stores inventory is meaningless. The evidence does not support, but, to the contrary, refutes, the assumption that the dollars reflecting the various changes in prices, as disclosed by the twenty-seven departments in the ware-

house, were of the same ratio in the retail stores. To illustrate: The goods in the stores in the various departments or classifications were replenished from day to day and remained fairly constant, whereas the goods in the warehouse, in some instances, were replenished only once during the year. The goods in such latter classifications would necessarily be constantly decreasing until the times in the next year when the year's supply of goods in those classifications would be replenished. Accordingly, the goods in the warehouse, as between departments or classifications, did not, as in the stores, remain fairly constant, and we have no way of assessing any weight or value to the results which would obtain in applying the factor of 113.70 to the closing inventory in the stores.

The record shows that in seventeen of the twenty-seven classifications of goods from which the factor of 113.70 was computed, the increase in the cost of goods between the beginning of the year and the close of the year was less than the over-all factor of 113.70 computed after giving effect to the dollars of inventory in each classification, and that in seven of these seventeen classifications there was a decrease in cost, rather than an increase. Accordingly, if the goods in the retail stores in those classifications were correspondingly greater in dollars than the goods in those classifications in the warehouse, while the goods in other classifications were comparatively the same or less, then it, of course, follows that to that extent the 113.70 factor is excessive if applied to the inventory in the stores. In the case of the classification of canned fruits and fruit juices, which was the largest classification in dollars in the warehouse, the factor was 117.24, while in the case of canned vegetables and vegetable juices, the second largest classification, the factor was 112.43. It may be noted at this point that at the beginning of the year the situation was reversed and that the dollar value of canned vegetables and vegetable juices was greater than that of canned fruits and fruit juices. Both of these classifications were in character goods which, witnesses testified, were bought generally about once a year. In contrast, the stocks of such goods, as well as those of all other classifications, in the stores were kept fairly constant from day to day. The record does show, however, that in only seven of the twenty-seven classifications used in arriving at the factor of 113.70 did the cost decrease between the beginning of the year and the end of the year. With respect to the other twenty classifications, the costs increased in varying amounts from 1.03 per cent to 43.64 per cent, though, as previously stated, in seventeen of the twenty-seven classifications the increase was less than 13.70 per cent. It is reasonable, therefore, to conclude, we think, that there was some increase in the cost of goods in the stores at the end of the year over the cost of such goods at the beginning of the year, even though we do not know the extent of such increase. With respect to

the retail stores inventory, therefore, this case in that respect becomes a case in which the rule laid down in *Cohan* v. *Commissioner*, 39 Fed. (2d) 540, should apply. Applying the rule in that case, and bearing most heavily against the petitioners, upon whom the burden of proof rested, it is our judgment, and we conclude, that the increase factor in the cost of goods in the closing inventory for the retail stores over the cost of such goods at the beginning of the year was 107, and that effect should be given to that conclusion in computing the deficiencies, if any, hereunder. Obviously the petitioners, without changing from the retail method of taking the retail stores inventory (which was no small part of their total inventory, since it was approximately one-third of the whole), could have made the percentages of increase in cost of goods in the warehouse applicable to the goods in the retail stores simply by taking the dollar value of the stores inventory according to the twenty-seven classifications used in the warehouse inventory, which classifications petitioners so convincingly defended and showed to have actually been copied from the groupings of goods in retail stores. We are not, however, concerned with the method of proving the necessary fact, or the form it takes, and proof of the cost of the goods at the end of the year at beginning of the year prices by any other method would be as effective. Inasmuch, however, as petitioners have not made proof of the increased costs of the retail stores inventory beyond that discussed, we have been forced to do the best we can in the circumstances.

The petitioners contest the respondent's disallowance of $2,536.46 of the deduction of $3,331.46 taken for traveling expenses, contending that such expenditures were ordinary and necessary expenses incurred in carrying on their retail grocery business. They also insist that the evidence shows that they were entitled to the full amount of the deduction taken.

The evidence does not show a break-down of the deduction of $3,331.46 or of the $795 allowed by respondent. However, the respondent states on brief, and it is not denied by petitioners in their reply brief, that $1,436.66 of the deduction was taken by petitioners for expenditures in connection with the "national tour" or the New York-California trip; $526.80 in connection with the Louisville trip; and $1,073 in connection with the Rochester, Minnesota, trip, or a total of $3,036.46 for the three trips, thus indicating that $295 was taken for traveling expenses incurred in some other connection. It is further stated by the respondent that he allowed the petitioners a deduction of $500 with respect to the "national tour," but disallowed the amounts deducted with respect to the Louisville and Rochester trips, thus indicating the allowance of $295 taken by petitioners for traveling expenses incurred in some connection other than the three trips. Our discussion will be on the assumption that deductions were

taken and allowance and disallowances were made as stated by the respondent. The question here, then, is whether the petitioners are entitled to deduct as traveling expenses an additional amount of $936.66 with respect to the "national tour" and to deduct the amounts of $526.80 and $1,073 with respect to the Louisville and Rochester trips, respectively.

On brief, the petitioners admit that none of the trips was wholly for business purposes and that the pleasure element was involved in each of them. However, they contend that they were careful to segregate all expenditures into personal expenses and business expenses and to deduct only those expenses which were incurred in connection with the pursuit of their business. Obviously, such a segregation of expenditures incurred under the circumstances here presented would require the drawing of fine distinctions. This would be true even if ample records were kept showing the items and amounts involved in such expenditures for the various trips. According to Basse, such records were not made or maintained, but, instead, when a trip was ended he ascertained the total amount expended and estimated the portion thereof which was chargeable to business expenses. Being without records, the petitioners have submitted the testimony of Basse in support of the deductions. His testimony was directed primarily to what was done on the various trips, rather than toward the amounts expended for specific items or purposes. Except for the item of railroad fare in the case of the "national tour" and the trip to Louisville, we are not informed as to what amount was expended for any particular item or purpose on any of the trips.

From Basse's testimony, it appears that the only portion of his time on the "national tour" which could be considered as devoted to business purposes was devoted to contacting various concerns to see what they were doing and to "keep in contact" with them. A substantial part of the contacts made was by telephone. So far as disclosed, the portion of Carrie Hartz Basse's time on this trip which was devoted to such purposes, or any other possible business purpose, was negligible. No purchase of merchandise for the business was made on the trip and, so far as shown, none was intended when the trip was begun. According to Basse, the railroad fare for the trip was at a special rate. This special rate was availed of by petitioners to make a stopover in Sun Valley, for what appears to have been a vacation comprising upwards of one-half of the time they were away from San Antonio.

In allowing $500 as deductible traveling expenses with respect to the "national tour," the respondent recognized that this trip was in part for business purposes. From the evidence submitted we are unable to find that he erred in not determining that a greater amount of the deduction taken was allowable.

The respondent allowed no portion of the deductions taken with respect to the trips taken to Louisville and to Rochester. No amount is claimed with respect to Carrie Hartz Basse's trip to Rochester, but claim is made for allowance on account of the son's expenses on this trip and his further travel to Chicago. So far as Basse and Carrie Hartz Basse were concerned with respect to the Louisville trip, and so far as Basse was concerned with respect to the Rochester trip, the business element involved was so tenuous that neither of the trips can properly be classified as even being in part for business purposes. During 1941 and for a year or so prior thereto the son of the petitioners had owned and operated his own merchandising business. In 1941 he looked after the advertising for the business of the petitioners and at times, in the absence of Basse, managed the business of the petitioners. The petitioners have not shown, nor are we able to see, how this limited relationship of the son to the business of the petitioners so identified him with their business as to warrant the conclusion that expenditures incurred by him in traveling with them to Rochester and then later going to Chicago to get acquainted with various concerns there with whom the petitioners transacted business constituted business expenses deductible by petitioners. So far as we can determine, what the petitioners did was merely to give the son a trip during which he might, among other things, make business acquaintances in Chicago which would be available to him in the conduct of his business. Without a showing of a more direct relationship of the son's activities on the trip to the business of the petitioners than has been shown here, we find no basis for holding that the son's traveling expenses constituted ordinary and necessary expenses of the petitioners. In view of the foregoing, the respondent's disallowance of the deductions taken with respect to the Louisville and Rochester trips is sustained.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

OPPER, *J.*, dissenting: The sole controversy under the first issue is the right of petitioners to apply the last in, first out method to a retail business whose inventories are kept in terms of dollars. This issue I had supposed was settled by *Hutzler Brothers Co.*, 8. T. C. 14.

That this is the sole controversy appears from the pleadings, from the opening statements of both counsel, and from the briefs. Respondent's counsel summed it up when he said at the commencement of the hearing:

\* \* \* I think, your Honor, that the ultimate determination of this question will turn on the interpretation of Section 22 (d) and the regulations issued thereunder.

While petitioners asserted their right to the use of the lifo method—a right denied by respondent—they nowhere took the position that the details of the method used by them, or the scope of their proof, were at all exclusive. One of the respects in which respondent's determination is said in the petition to be erroneous is that:

The Petitioner having elected in good faith to adopt the "Last-in, First-out" method of inventory, and the Commissioner having refused the particular procedure and plan used by the Petitioner, the Commissioner erred in not redetermining the inventory of the Petitioner on a "Last-in, First-out" method deemed correct by him.

This proposition was never abandoned by petitioners, and in his opening statement petitioners' counsel reiterated:

The petitioners contest each of the determinations of deficiency thus made. * * * They further contend * * * that an opportunity should have been afforded them to meet any objections made to their method and that a deficiency could not properly be determined against them unless they refused to meet the objections, or unless after meeting the same, there existed a deficiency.

In that posture of the case they produced the factual proof and established the figures contained in their application for use of the method and in their petitions. So far as appears, all of the material available was properly shown. Nowhere at the trial or in his brief does respondent complain that petitioners' proof was inadequate. Nowhere does he draw a distinction between the sufficiency of petitioners' method as applied in the warehouses and in the retail stores.

Even under ordinary circumstances, a situation of this sort would seem to me to require at the minimum that petitioners be given a further opportunity to supply a deficiency in proof of which the reading of the majority opinion will for the first time advise them. But this is not an ordinary case. Subsequent to this hearing, several things have happened. In *Hutzler Brothers Co.*, *supra*, decided after the hearing in this case, we said (p. 32) :

The adoption of appropriate details to accomplish the general purpose of applying the Lifo method to retail merchants could well be the subject of an administrative regulation. It might then be that any reasonable and practical method directed by the Commissioner would be mandatory to the exclusion of others not thought by him to be adequate or authoritative.

This suggestion seems to me in effect to be merely an alternative phrasing of the position of petitioners in this proceeding presented by their allegation of error and opening statement already quoted. No such regulation had, of course, been issued when this proceeding was heard, nor, indeed, at the time of the *Hutzler Brothers Co.* opinion. But respondent has now announced his intention of issuing such a regulation, retroactive to include the very period which is here before us. Federal Register, Dec. 24, 1947.

Had such a regulation been in effect when this proceeding was instituted, petitioners could not have assigned as error the Commissioner's failure to supply petitioners with a method of computing a lifo inventory. The subsequent decision in the *Hutzler Brothers Co.* case and the proposed regulation seem to me to have the effect of an acknowledgment on the part of respondent that to that extent the assertion of error in the petition is well founded. The only reasonable upshot would be to give the parties an opportunity to make this record consistent with these now accomplished facts; to give respondent an opportunity to recompute the deficiency, if any, in accordance with his own proposed regulation; and thereupon to give petitioners an opportunity to take an informed position with respect to the figures that would then appear. But, at the very least, the decision should not go against petitioners now, and particularly not for a failure of proof.

The effect of the present disposition seems to me either to misapply the doctrine of the *Cohan* case because there was here no "inexactitude" of the taxpayers' "own making"; or, on the other hand, to require the abandonment of petitioners' present inventory method—a system which has been for many years sufficiently precise for the purposes of petitioners' business and sufficiently reflective of true income to be acceptable to respondent. To this length we were unprepared to go in *Hutzler Brothers Co., supra.*

It may indeed be said that petitioners and respondent can not yet arrive at the figures contemplated by the new regulation, which remains in tentative form through deference to the provisions of the Administrative Procedure Act, section 4. But that merely convinces me of the exquisite inappropriateness of attempting to dispose of this proceeding at this particular pinpoint of time.

MURDOCK, *J.*, agrees with this dissent.