**ACACIA MUTUAL LIFE INSURANCE COMPANY**

v.

**UNITED STATES of America.**

Civ. No. 16469.

United States District Court
D. Maryland.

July 26, 1967.

Laurens Williams, James V. Heffernan and Sutherland, Asbill & Brennan, Washington, D. C., and William H. Gorman, II, and Niles, Barton, Gans & Markell, Baltimore, Md., for plaintiff.

Moshe Schuldinger and Allen L. Schwait, Dept. of Justice, Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., and Thomas J. Kenney, U. S. Atty., and Ronald T. Osborn, Asst. U. S. Atty., Baltimore, Md., for defendant.

HARVEY, District Judge:

Acacia Mutual Life Insurance Company (Acacia) sues here to recover the sum of $82,279.36, representing the amount of withholding taxes and interest paid under protest for the years 1958, 1959 and 1960. Acacia is a mutual life insurance company doing business in some thirty-three states and the District of Columbia.

In the years in question, meetings were held by Acacia in various resort areas attended by branch managers, unit managers, agents and home office personnel, as well as by some of their wives. Acacia paid the expenses of all employees and wives who attended these meetings. Following audit of Acacia's Employer's Quarterly Federal Tax Return (Form 941) for the three years in question, the Commissioner of Internal Revenue claimed that such expenses represented wages within the meaning of § 3401(a) of the Internal Revenue Code of 1954, that Acacia was required to withhold upon such wages under § 3402(a) and that Acacia was liable for failure to withhold under § 3403.[1] Deficiencies were subsequently assessed against Acacia, and $82,279.36 was thereafter paid on October 14, 1964, representing the amount of tax plus interest claimed by the Government.[2] After duly filing a claim for refund with the District Director of Internal Revenue at Baltimore, Maryland, Acacia thereafter timely filed suit in this Court seeking to recover the full amount paid plus interest from the date of payment.

*Facts*

The parties have entered into a formal Stipulation of Facts which includes over

---

1. 26 U.S.C.A. §§ 3401(a), 3402(a) and 3403.

2. The deficiencies assessed and paid by Acacia, together with interest, are as follows:

| Period | Tax | Interest | Total |
|---|---|---|---|
| 3rd quarter 1958 | $ 9,746.66 | $3,472.85 | $13,219.51 |
| 4th quarter 1958 | 13,154.26 | 4,489.72 | 17,643.98 |
| 1st quarter 1959 | 17,168.81 | 5,605.28 | 22,774.09 |
| 2nd quarter 1960 | 22,889.37 | 5,752.41 | 28,641.78 |
| Totals | $62,959.10 | $19,320.26 | $82,279.36 |

280 documentary exhibits. In addition, Acacia called some ten witnesses to testify, and other exhibits were admitted in evidence at the trial.

With 65 branch offices maintained in the District of Columbia and the 33 states in which it does business, Acacia sells only life insurance and annuities. The personnel of the various branch offices include branch managers, unit managers and agents (or salesmen), as well as the necessary clerical and other administrative employees. Practically all of Acacia's sales are made by members of this so-called "Agency Force," the size of which ranged from 500 to 542 persons for the years involved here.

The Home Office located in the District of Columbia has primary responsibility for recruiting, training and supervising the Agency Force. Each branch manager is responsible for such activities in the geographical area in which his branch operates, while unit managers, acting under branch managers, have similar responsibilities in small groups or units of agents within the branch.

After a preliminary period, all members of the Agency Force are compensated for their work by commissions, monthly income and bonuses, all related to the production of new business by and the amount of business in force in the account of a branch office, a unit or an agent. Some agents receive supplemental compensation under a financing agreement.

A continuing problem encountered by Acacia in its operations has been the recruitment, training and retention of agents. During a three-year period commencing July, 1963, aptitude tests were administered to 3545 prospective agents, of which 386, or about 11%, were employed.[3] Of those actually placed under contract, 50% left Acacia's employ within the first twelve months; another 16% left during the second year, and yet another 11% during the third year. After five years, only 16%, or one out of six, of those originally employed were still with the Company.

For many years Acacia has been conducting meetings of certain members of its Agency Force held in different resort areas. In some years, it holds only "leaders" meetings, attended by more select, higher caliber members of the Agency Force. In other years, it holds both leaders meetings and "regional" meetings, the latter being attended by a larger group of its personnel.[4]

In 1958, Acacia held an Eastern Regional and an Eastern Leaders Meeting as well as a Western Regional and a Western Leaders Meeting. The eastern meetings in 1958 were held at The Greenbrier Hotel, White Sulphur Springs, West Virginia, as follows:

| Meeting | Dates |
|---|---|
| Regional | August 31–September 3 |
| Leaders | September 4–September 5 |

The western meetings in 1958 were held at The Stanley Hotel, Estes Park, Colorado, as follows:

| Meeting | Dates |
|---|---|
| Regional | September 21–September 24 |
| Leaders | September 25–September 26 |

3. The statistics admitted in evidence covered the years 1963–1966. Testimony indicated that Acacia's experience was the same for the years 1958–1960.

4. In each of the years when both regional and leaders meetings were held, they were scheduled for contiguous dates, and typically all members of the Agency Force and their wives who attended the leaders meetings also attended the regional meetings in such year.

The attendance at these meetings was as follows:

| Meeting | Agency Force Qualifying | Agency Force Attending | Wives Attending | Home Office Personnel Attending | Home Office Wives Attending | Children Attending |
|---|---|---|---|---|---|---|
| Eastern Regional | 225 | 213 | 126 | 18 | 7 | 53 |
| Eastern Leaders | 78 | 77 | 71 | 12 | 5 | 31 |
| Western Regional | 141 | 128 | 77 | 18 | 6 | 17 |
| Western Leaders | 44 | 44 | 41 | 18 | 6 | 8 |

In 1959, one meeting was held, a National Leaders Meeting, at the Palm Beach-Biltmore Hotel, Palm Beach, Florida, on March 23–25. Attending at this meeting were the following:

| Agency Force Qualifying | Agency Force Attending | Wives Attending | Home Office Personnel Attending | Home Office Wives Attending | Children Attending |
|---|---|---|---|---|---|
| 172 | 166 | 154 | 15 | 6 | 65 |

In 1960, as in 1958, an Eastern Leaders Meeting and an Eastern Regional Meeting, as well as a Western Leaders Meeting and a Western Regional Meeting, were held. The 1960 eastern meetings were held on April 4–8 at the Belleview-Biltmore Hotel, Belleaire, Florida, and the 1960 western meetings were held on May 2–6 at the Camelback Inn, Phoenix, Arizona.

In attendance at the 1960 meetings were the following:

| Meeting | Agency Force Qualifying | Agency Force Attending | Wives Attending | Home Office Personnel Attending | Home Office Wives Attending | Children Attending |
|---|---|---|---|---|---|---|
| Eastern Leaders | 69 | 66 | 58 | 18 | 5 | 24 |
| Eastern Regional | 253 | 239 | 114 | 18 | 5 | 52 |
| Western Leaders | 42 | 37 | 34 | 16 | 5 | 8 |
| Western Regional | 119 | 108 | 59 | 16 | 4 | 25 |

Acacia paid all of the expenses of those in attendance at these meetings, including the expenses of wives, except that it did not pay for personal expenses,

nor the expenses of children who attended. The number of Home Office personnel attending the meetings depended on the expected need at each meeting and the subjects to be discussed. Other personnel had to qualify for attendance in one way or another.

All of Acacia's branch managers except those whose performance was so poor that their contracts were about to be terminated were requested to attend one of the regional meetings held in 1958 and 1960. A branch manager was qualified to attend one of the leaders meetings in those two years if in the calendar year preceding such meeting he had scored 125 or more points on a rating system which Acacia maintained for branch and unit managers. A score of 100 or more qualified a branch manager to attend the National Leaders Meeting in 1959. The rating system was based on the awarding of points for various aspects of a manager's activities including development of manpower, level of production, quality of business and development of competent unit or assistant managers.

Wives of all branch managers attending the regional meetings were also qualified to attend if in the preceding calendar year the branch manager had scored 100 or more points under such rating system. Every wife of a branch manager qualified to attend a leaders meeting was likewise qualified to attend such a meeting.

With reference to unit managers, a similar rating system was in effect. For the years in question, 50 or more points were necessary to attend a regional meeting, 125 or more for a leaders meeting and 100 or more for the national meeting in 1959.[5] Wives of unit managers could attend the regional meetings if their husbands had scored 100 or more rating points. Every wife of a unit manager qualified to attend one of the leaders meetings was likewise eligible to attend such meeting.

The standard for qualification of agents was based upon the record of an agent's performance during a predetermined period prior to the meeting. Such period was the preceding eighteen months for the 1958 and 1960 regional meetings and the preceding calendar year for all the leaders meetings. The standards for qualification varied from time to time. For the 1958 regional meeting, it was required that an agent during the qualification period must have sold "net new business" of $300,000,[6] that the ratio of net new business to total new business placed must have been seventy-five per cent or better, and that the agent must have earned first year commissions of $3,000 or more.[7] Similar, but higher standards applied for the 1958, 1959 and 1960 leaders meetings. Higher standards were likewise put into effect for the 1960 regional meetings.

For the wife of an agent to attend a regional meeting, it was necessary for the agent to have sold in the qualifying period an additional amount of $150,000 of net new insurance and to have earned an additional commission of $1,500 beyond that required for the agent himself to attend.[8] If an agent qualified to attend one of the leaders meetings, his wife was also automatically eligible to attend such meeting.

At a typical regional meeting, those in attendance and their wives would arrive

5. Alternatively, unit managers were entitled to attend the 1958 and 1960 leaders meetings and the 1959 national meeting if their personal production of new business during the qualification period had equaled or exceeded the performance standards set for the qualification of agents for attendance.

6. "Net new business" was defined as insurance having a face value which equaled at least $300,000 after reduction by the face amount of insurance sold by such agent which, within two years after it was written, was surrendered, reduced or lapsed during the qualification period.

7. Reduced standards applied for certain newly-appointed agents, for agents who had reached 65 years of age with ten years of service and for those who were 70 with fifteen years of service.

8. Slightly reduced standards applied for the wives of newly-appointed agents.

and register on a Sunday, with no planned activities on the program for that day other than a "get-together" reception before dinner. Formal meetings were scheduled for each of the next three days, starting at 9:30 a. m. and ending at approximately 12:30 or 1:00 o'clock p. m. These programmed sessions were attended by all members of the Agency Force. Other than the opening meeting and an occasional special meeting, wives did not attend, except that a particular wife might come to hear her husband address the group.

After lunch separate individual or group meetings were held lasting until about 3:30 p. m.[9] At these informal afternoon sessions, agents and branch or unit managers had an opportunity to discuss particular problems with various Home Office representatives.

On the final evening of a regional meeting (a Wednesday during the 1958 meetings), both husbands and wives would attend a banquet at which Acacia's president would deliver an address. Those who qualified for the leaders meetings would stay over for the next two days with a similar program planned for those days.[10]

In filing its employer's quarterly returns for the three years in question, Acacia did not treat as wages, nor withhold the expenditures made for those in attendance at these meetings. None of the persons attending the meetings reported any part of these amounts as gross income in individual or joint tax returns, nor did any of such persons claim any deduction in respect of such amounts. The statute of limitations has now barred the assessment of any income tax deficiencies in respect of the years

involved herein against the individuals attending these meetings.

### The Statutes and Regulations

For the years in question the statutes here involved provided as follows:[11]

§ 3402(a) "Requirement of withholding. Every employer making payment of wages shall deduct and withhold upon such *wages* * * * a tax equal to 18% of the amount by which the wages exceed the number of withholding exemptions claimed, multiplied by the amount of one such exemption as shown in subsection (b) (1)." (Emphasis added)

§ 3401(a) "Wages. For purposes of this chapter, the term 'wages' means all *remuneration* (other than fees paid to a public official) *for services performed* by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash; * * *." (Emphasis added)

§ 3403 "The employer shall be liable for the payment of the tax required to be deducted and withheld under this chapter, and shall not be liable to any person for the amount of any such payment."

The question here for decision is whether the payment by Acacia of the expenses of various employees and their wives attending the company meetings held at resort hotels in the years 1958–1960 constituted the payment of "wages" within these sections of the Internal Revenue Code. The Court must determine here whether the payment of such expenses represented "remuneration * * * for services performed" by Acacia's employees under § 3401(a), as

---

9. One of the three afternoons was kept free for recreational activities.

10. At the 1958 leaders meetings formal programs were planned for both mornings. There being no regional meeting in 1959, the leaders meeting in that year followed the three day schedule outlined herein. The 1960 leaders meetings included a full program for the first day with the second day left open for recreational activities.

11. § 3402(a) was subsequently amended by P.L. 88–272, effective March 5, 1964; by P.L. 89–97, effective after December 31, 1965, and by P.L. 89–368, effective after April 30, 1966. Such amendments are not pertinent to the issues in this case. §§ 3401(a) and 3403 are in the same form today as for the years 1958–1960.

claimed by the Government, or represented the payment of ordinary and necessary expenses incurred in the employer's business, as contended by Acacia.

Acacia argues that the bulk of the expenses of the meetings, including transportation, hotel and meals, fall within Reg. § 31.3401(a)–1(b) (2), "Traveling and other expenses," which provides:

"Amounts paid specifically—either as advances or reimbursements—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages and are not subject to withholding * * *."

Acacia further claims that the balance of the expenses of the meetings come within Reg. § 31.3401(a)–1(b) (10). "Facilities or privileges," which provides:

"Ordinarily, facilities or privileges (such as entertainment, medical services, or so-called 'courtesy' discounts or purchases), furnished or offered by an employer to his employees generally, are not considered as wages subject to withholding if such facilities or privileges are of relatively small value and are offered or furnished by the employer merely as a means of promoting the health, good will, contentment, or efficiency of his employees."

On the other hand, the Government contends that payment by Acacia of the meeting expenses of an employee and his wife was in the nature of a prize or award to such employee for services performed. The Government points to the qualification standards and argues that in striving to meet such standards, an employee performs services for which he is remunerated by an award in the form of a trip to a resort hotel for himself and his wife.

### Discussion

Both parties agree that the issue here is substantially one of fact. However, at the outset there is disagreement as to whether, as claimed by Acacia, the purpose of the employer in making these expenditures is determinative of the issue, or whether, as contended by the Government, other factors must control including the purpose of the employee in attending any such meeting.

In this connection, the Government relies on two decisions of the Fifth Circuit, Patterson v. Thomas, 289 F.2d 108 (5th Cir. 1961), cert. den. 368 U.S. 837, 82 S.Ct. 35, 7 L.Ed.2d 38 (1961), and Rudolph v. United States, 291 F.2d 841 (5th Cir. 1961), affirming 189 F.Supp. 2 (N.D.Tex.1960), certiorari dismissed as improvidently granted, 370 U.S. 269, 82 S.Ct. 1277, 8 L.Ed.2d 484 (1962). In each of these cases, it was held that the value of a convention trip to an insurance salesman was income to the taxpayer involved under the particular facts of the case. In *Thomas*, the court held that the nature of the trip must be determined from the individual taxpayer's point-of-view rather than from that of his employer. In the *Rudolph* case, the Fifth Circuit Court of Appeals affirmed the lower court's finding of taxability in a *per curiam* opinion, and certiorari was granted by the Supreme Court. 368 U.S. 913, 82 S.Ct. 195, 7 L.Ed.2d 130 (1961). After argument, the Supreme Court decided that certiorari had been improvidently granted and dismissed the writ. 370 U.S. 269, 82 S.Ct. 1277 (1962). In its *per curiam* opinion, the Court said the following at pages 269–270, 82 S.Ct. at page 1278:

"* * * An insurance company provided a trip from its home office in Dallas, Texas, to New York City for a group of its agents and their wives. Rudolph and his wife were among the beneficiaries of this trip, and the Commissioner assessed its value to them as taxable income. It appears to be agreed between the parties that the tax consequences of the trip turn upon the Rudolphs' 'dominant motive and purpose' in taking the trip and the company's in offering it. In this regard the District Court, on a suit for a refund, found that the trip was provided by

the company for 'the primary purpose of affording a pleasure trip * * * in the nature of a bonus, reward, and compensation for a job well done' and that from the point of view of the Rudolphs it 'was primarily a pleasure trip in the nature of a vacation * *.' 189 F.Supp. 2, 4–5. The Court of Appeals approved these findings. 291 F. 2d 841. Such ultimate facts are subject to the 'clearly erroneous' rule, cf. Commissioner [of Internal Revenue] v. Duberstein, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960), and their review would be of no importance save to the litigants themselves. * * *"

█ The question in both of those cases, however, was whether the value of the trip was "gross income" to the employee under § 61 of the Internal Revenue Code of 1954. Here the issue is whether the expenses of the meetings represented "remuneration" under § 3401 (a) paid by the employer "for services performed" by an employee. Congress could hardly have intended that the determination of the latter question would be controlled by the individual motive of each separate employee in attending the meeting. One employee might view the trip as primarily a vacation; another, more highly motivated, might see it as a means of improving his business capabilities. It should be noted that in both *Thomas* and *Rudolph* the court considered the statute from the taxpayer's point-of-view. With the employer as taxpayer here, this Court concludes that it is the purpose of the employer that controls in determining whether payments are remuneration under § 3401(a) for services performed.

█ Various factors, however, are relevant in ascertaining the true motive of the employer. The testimony of officers of the employer concerning the company's purpose must be compared with the documentary evidence. In addition, the objective facts as to the meetings themselves are pertinent in determining whether the employer's purpose is actually what it is claimed to be. The qualification standards for attendance, the extent of the preparation for the meetings, the agenda, and the amount of time which those in attendance spent at the business sessions as compared to that devoted to recreational activities are all relevant in ascertaining whether, under the circumstances here present, these trips were intended as prizes or awards to the employees or not.

Different considerations apply to different categories of employees and their wives. For the purposes of this opinion and for the reasons stated in the discussion that follows, the various personnel have been divided into the following categories: (1) Home Office personnel and branch managers; (2) unit managers and agents; (3) wives of Home Office personnel; and (4) wives of branch managers, unit managers and agents.

(1) *Home Office personnel and branch managers.*

█ Included in the deficiencies assessed by the Government were expenses attributable to Home Office personnel and branch managers who attended the regional and leaders meetings in the three years in question.[12] At the trial, the Government conceded that payment of the expenses of these individuals was not remuneration to them for services performed.[13] Acacia is, therefore, entitled to a refund of the amounts attributable to these individuals, plus interest.

(2) *Unit managers and agents.*

Both unit managers and agents were required to meet certain qualification standards before they could attend any of the meetings. Higher standards applied to leaders meetings than to regional meetings. The Government places considerable stress on the existence of these

---

12. All of the expenses of branch managers were included and at least some of the expenses of Home Office personnel.

13. No such concession was made as to the expenses of wives of Home Office personnel and of branch managers.

standards, arguing that they in effect establish a competition with the prize for those competing successfully being a trip to a resort hotel.

Acacia does not deny that the cash value of prizes won by agents in contests held for the purpose of stimulating sales constitutes wages paid to such agents subject to withholding. See Rev.Rul. 55–232, 1955–1, Cum.Bull. 115. In fact, each year Acacia holds a number of such special contests and withholds on the value of the prizes awarded to the successful agents. However, Acacia's witnesses stated that the qualification standards were no more than objective means of selecting those to attend the meetings. They noted the short (30 to 60 days) period of the sales contests as compared to the long (12 to 18 months) qualifying period used for the meetings.

Testimony concerning the general nature of Acacia's operations is relevant here in determining what in fact was the purpose of the qualification standards. The evidence here discloses that the recruitment, training and retention of agents is a continuing problem faced by Acacia and other companies in the life insurance industry. The sales resistance encountered by a life insurance agent differs from that met by other salesmen. What is being sold is an intangible, deferred benefit and not a specific commodity which at the time of sale provides immediate gratification of a felt need.[14] Under such circumstances, a life insurance agent lives in what one witness described as a "negative" world in that he is asking prospective purchasers to make decisions that they would prefer to put off and to spend money in the present to provide for his family in the future. The rebuffs and frustrations encountered are such as to cause a large and continuing turnover of agent personnel. One-half of the agents hired by Acacia leave within the first year; two-thirds are gone after two years, and only one out of six remains after five years.

Faced with such figures, Acacia's executives decided that not all of its unit managers or agents should be invited to attend its annual meetings, but only those for whom the substantial expenditures required might appear justified. However, selection of those to attend subjectively by means of the exercise of personal judgment would create morale problems within the various branches. Accordingly, objective qualification standards were drawn up as a basis for deciding if an individual would attend or not.

The standards for attendance were set sufficiently low that a substantial percentage of the Agency Force might be expected to qualify for the regional meetings. In fact, over 70% qualified for the 1958 Eastern Regional Meeting. When standards are set so low that more than two-thirds of those eligible qualify, the competitive aspects of qualification are minimized.

On the record as a whole, the finding here is that the qualifying standards as applied to unit managers and agents were not designed primarily to spur these individuals to greater production (although incidentally they may have had such effect). Rather, they were objective means whereby a substantial portion of the Agency Force might be selected to attend the meetings and whereby the company might be assured that those selected could be expected to be the most stable and enduring employees.[15]

Consideration must next be given to the activities conducted at the various meetings themselves. At one

14. A sale of life insurance is the exact opposite of an installment sale under which the purchaser enjoys the product now and pays for it later.

15. Plaintiff's Trial Exhibit 7 compares post-selection results of both qualifiers and non-qualifiers. In 1958, the average business placed by qualifiers as a group amounted to $407,420, as compared to $136,591 for the non-qualifiers. By December 31, 1959, 84% of those qualifying for the 1958 meetings were still with Acacia as compared to 44% of the non-qualifiers.

end of the scale it could hardly be doubted that if a company sent its salesmen to a full-time seminar on selling methods conducted in a wholly business setting, the expenses of such a meeting would not constitute additional remuneration to the employee, but would in fact be ordinary and necessary expenses incurred in the business of the employer under Reg. § 31.3401(a)–1(b) (2). On the other hand, the expenses of a trip devoted entirely to pleasure with no business at all transacted would clearly constitute wages to an employee for withholding purposes. Campbell Sash Works, Inc. v. United States, 217 F.Supp. 74 (N.D. Ohio 1963). The facts of the present case lie somewhere between these two extremes.

■ The evidence discloses that careful and extensive planning preceded each of the meetings. Topics for the formal sessions were discussed many months in advance, and participants were given ample time for careful preparation. After the meetings, follow-up conferences were held at the various branch offices for those who did not attend.

At the typical regional meeting, every morning was devoted to a planned business session. The agenda included serious subjects designed to make those present more effective in their sales activities.[16] The last afternoon of a three-day regional meeting was free, but the other two afternoons were set aside for individual meetings between Agency Force personnel and members of the Home Office. At that time, agents from the various branch offices were given an opportunity to meet with Home Office personnel on specific problems. For example, the testimony described afternoon meetings arranged with Acacia's general counsel, underwriting vice-president and actuary to discuss estate planning, trust and tax problems. Although the afternoon program was not compulsory and many agents no doubt engaged in recreational activities, the finding here is that such informal sessions were well attended.

In contending that the convention trips represented prizes or awards given for services performed, the Government places heavy reliance on descriptions of the meetings contained in the weekly company publication entitled the "Acacia Clarion." That the *Clarion* promoted attendance at the meetings in glowing terms is quite clear.[17] In contrast, company executives took a somewhat different view of the purpose of these gatherings.[18] Neither party denies that the meetings included both business and recreational activities. That the publicity department would emphasize the latter in urging attendance is hardly surprising. However, when the evidence as a whole is compared with the accounts contained in the *Clarion,* the finding here is that the publicity department's statements did not constitute an expression of over-all company policy as to the dominant purpose of the trips. That some agents may even have been misled into believing that the meetings were primarily vacation trips is of no con-

16. At the 1958 regional meetings, the agenda included a discussion of two new company-wide programs, a so-called "Family Plan" and a "New Pension Trust Program."

17. In the July 30, 1958 issue, the Stanley Hotel in Estes Park, Colorado, was described as follows:
"This very fine resort hotel is located in one of the most beautiful sections of the Colorado Rockies. The view from the front porch is almost breathtaking with Longs Peak looming majestically in the background. Unlike most resort hotels, however, the beautiful scenery is not limited to one side of the house—at the Stanley you are surrounded by the towering mountains which form the Continental Divide. Experienced world travelers say the Stanley surpasses the best the Swiss Alps have to offer."

18. In a letter to all attending the 1960 leaders meetings, the Agency Vice President said the following:
"Since the meetings for the Leaders on Monday, both in the morning and afternoon, will be regular business meetings, it is expected that every qualified man will attend all sessions."

sequence in view of the substantial facts in the record which conclusively show the serious nature of these gatherings.

The Government further emphasizes that the meetings were held at resort-type hotels. The testimony indicates that Acacia purposely chose a large hotel operating on the American plan and not located in a sizable city. Such planning was designed to secure a "captive audience" which would not be diverted by the many distractions of a large city and which would be together even for all meals.

In support of its position here, Acacia cites the recent case of People's Life Insurance Company v. United States, 373 F.2d 924 (Ct.Cl.1967). The issue in that case was identical to the one presented here, namely, whether a life insurance company is taxable under § 3403 for expenditures made by it for conventions attended by certain of its employees and their wives. That case was referred to a trial commissioner who concluded that the expenses of all of those attending including the wives did not constitute wages or remuneration within the meaning of the withholding tax provisions of § 3401. In a *per curiam* opinion, the Court of Claims adopted the opinion, findings and recommendation of the commissioner as the Court's judgment in the case.

Considering all the relevant facts and circumstances in the present case, this Court concludes that Acacia's dominant purpose in offering unit managers and agents the opportunity to attend these meetings was not to remunerate them for services performed but was in fact to improve the performance of its sales force through education and training. The facts of the present case are even stronger in support of this conclusion than were the facts of the *People's Life* case. There qualification was much more competitive, with only 20% of the agents qualifying for the convention. Although working sessions of about two hours were held in the mornings, both afternoons of the two-day meeting were free, and one such afternoon included a sightseeing tour arranged and paid for by the company. In this case, some 70% of the Agency Force attended the regional meetings, and two out of three afternoons were taken up with informal business sessions.

Patterson v. Thomas, supra, and Rudolph v. United States, supra, relied upon by the government, are not to the contrary. Assuming the pertinency here of these cases holding that trip expenses were gross income to the employees involved, it is clear that both *Rudolph* and *Thomas* are distinguishable on their facts. In *Rudolph* an insurance agent residing in Dallas, Texas, qualified for a convention trip to New York City for himself and his wife by having sold a predetermined amount of insurance. Travel to and from New York City was on special trains. The entire trip lasted some 6 days, and of that time only one morning in New York was devoted to a business meeting and group luncheon. The remaining time was spent on travel, sightseeing, entertainment and free time. The district court found that the trip was provided as a reward or bonus for the employee and that the value of the trip was gross income to such employee.

In *Thomas*, the insurance agent lived in Birmingham, Alabama. By meeting certain standards, the taxpayer and his wife qualified to attend the employer's annual Torch Club Convention held in Old Point Comfort, Ft. Monroe, Virginia. The taxpayer was away from his home for a week and of the three and one-half days of the convention, only five hours were spent in two formal business meetings. The first of such meetings consisted mainly of welcoming speeches and a review by the president of the company's activities during the past year. Included in the expenses paid by the company was the cost of a sightseeing trip to Williamsburg, Virginia, which alone consumed more time than did both of the business meetings. In making arrangements for the trip, a vice president of the company flatly stated in a letter to the hotel that "business was secondary,"

with the main object "to give our people a good time."

On the present record, the finding is that the bulk of the expenditures made by Acacia on behalf of its unit managers and agents are traveling or other bona fide ordinary and necessary business expenses and are not wages. Reg. § 31.-3401(a)–1(b) (2). The balance of such expenditures constitute facilities or privileges of relatively small value furnished to Acacia's employee's generally as a means of promoting their health, good will or efficiency and are likewise not to be considered wages. Reg. § 31.3401 (a)–1(b) (10). Since no withholding is required upon expenditures which are not wages, Acacia is entitled to a refund of these amounts plus interest.

### (3) *Wives of Home Office Personnel.*

■ The wives of Home Office personnel must be placed in a different category from the other wives in attendance at the meetings. No qualification standards were used to determine which of these wives would attend; rather they were selected on the basis of the need at a particular meeting.

Home Office wives chosen to attend met several weeks in advance of the meeting at a planning session at which they were briefed by the Agency Vice President. At the meetings themselves, such wives were assigned specific duties. They put together the kits handed out to each person attending; they manned the registration desks, and they scheduled the informal afternoon conferences. One Home Office witness testified that his wife had during the day no more than an hour and a half free time to herself at a regional meeting.

Such facts indicate that payment of the expenses of wives of Home Office personnel was not remuneration to their husbands for services performed. Since there was no competitive aspect involved in their selection, such expenditures clearly are not prizes or awards. The substantial involvement of these wives in the running of the meetings left them little time for day-time recreational activities. On balance, the facts show that Acacia's purpose in having these wives attend was not to give them a pleasure trip. The amounts paid for their expenses constitute ordinary and necessary expenses incurred by Acacia in its business and as such are not wages subject to withholding. Acacia may therefore recover the amounts attributable to the wives of Home Office personnel, together with interest.

### (4) *Wives of Branch Managers, Unit Managers and Agents.*

■ The facts as to the wives of branch managers, unit managers and agents are markedly different. As to these wives, qualification standards did apply. Furthermore, such wives were not assigned duties necessary for conducting the meetings themselves. Having already qualified for themselves, their husbands were required to meet higher and more exacting standards if their wives were to join them on a trip. With a smaller percentage of wives than husbands actually qualifying, the competitive nature of the qualification standards was thereby intensified as to these wives.[19]

Furthermore, these wives did not attend the business sessions, other than the opening meeting and an occasional special meeting, or when a wife would want to hear her husband speak.[20] These wives then were free during substantially the entire time spent at the resort to devote their activities to recreational or other pursuits. As one agent's wife testified, during a typical afternoon while her husband was seeing men from the Home Office and talking with other

---

19. For example, at the 1960 eastern regional meeting there were 239 Agency Force personnel attending, but only 114 wives.

20. At the 1960 regional meetings, a "Special Meeting for All Acacia Wives" was held at 10:00 A.M. on the second day. This was the only such event scheduled for any of the meetings held during the 3 years in question.

agents, she was at the swimming pool chatting with the other wives.

Articles in the *Clarion* describing the meetings seem directed more to the wives than to the husbands. Impressed by the alluring descriptions of the various resort hotels, a wife could be expected to exert pressure on her husband to increase his production so that she might enjoy an expense-free trip with practically no business responsibilities. In a speech delivered at the special gathering for wives held at the 1960 regional meetings, it was announced that the leaders meeting would be held in California in 1961. The Home Office speaker then said the following:

"For instance, if you want to go to California next year, all you have to do is have your husband qualify for 'leaders' this year. This morning we'd like to talk with you wives about ways you can help your husbands do their part to help the company realize this two billion dollar goal, and also help you wives *win* a trip to California next year or whatever *other prizes* may be offered between now and the attainment of the goal in 1961." (Emphasis added)

Acacia argues that wives of life insurance agents are unique and play such an important part in their husband's activities that there is a true business purpose in having them attend these meetings.[21] All wives are, of course, important to their husbands' success, whatever the field of endeavor. These wives here were not employees of Acacia, nor were they expected to attend · business sessions, as were their husbands. At both the regional and the leaders meetings, Acacia had assembled in one place the wives of its most productive agents and managers. Yet as shown by the formal agendas, little effort was made to plan lectures and other business sessions directed to the wives. Other than attending a few meetings and joining their husbands for meals, the wives were free to engage in whatever resort activities they might desire, in many instances in the company of their children. These facts belie the contention made on behalf of Acacia that the dominant purpose of having the wives attend these meetings was the same as that of having their husbands.

In the *People's Life Insurance Company* case, it was held that the expenses of wives as well as of husbands were not wages subject to withholding. However, as to the wives the facts of that case are substantially different from those here present. In the *People's Life* case, *all* wives of qualified agents attended. Wives were expected to be present at the meetings and the other planned activities, and parts of the formal programs were specifically directed to them. Of the ten speakers at the first business session, three were wives of agents while on the second day, two of the nine prepared speeches were delivered by wives. In the present case, not only is there more of a prize aspect to the qualification standards set by Acacia for the attendance of wives, but also the business activities of the wives at the meetings are considerably less than in the *People's Life* case.

Only under exceptional circumstances have the courts held that traveling expenses of a wife are deductible in a personal income tax return. In Warwick v. United States, 236 F.Supp. 761 (E.D.Va. 1964), the court allowed the deduction, finding that the wife's trip was directly attributable to her husband's business and that she assisted him in such business and in the production of his income. Judge Butzner said the following at page 767:

"The Court has reached this conclusion in part from the very unusual position that Mr. Warwick occupies in the business world, and the unusual nature of [the employer's] business."

In most cases dealing with the subject, courts have disallowed deductions taken

---

21. Before an agent is employed, his wife is interviewed. In addition, booklets are distributed to wives of new agents containing information and advice pertaining to the life insurance industry.

by a husband on his personal return for the expenses of his wife in attending business meetings or conventions with him. In Kloppenberg v. United States, 66–1 U.S.T.C. par. 9335 (S.D.Ill., 1965), the taxpayer was an agent of the Franklin Life Insurance Company who attended a convention with his wife at the Stanley Hotel, Estes Park, Colorado. A jury returned a verdict in favor of the taxpayer, upholding the deductibility of both his expenses and those of his wife. The district court granted the government's motion for judgment n. o. v. as under the facts in that record they could not be deducted by the husband on his personal return.

In Sheldon v. Commissioner, 20 T.C.M. 241 (1961), affirmed 299 F.2d 48 (7th Cir., 1962), the wife of the president of the National Association of Insurance Agents served as his hostess and performed certain other duties at various conventions. In denying the deductibility of her expenses, the Tax Court said the following at page 243:

> "The deductibility of the expenses of a wife in attending her husband's business meeting or convention requires a finding that she performed services necessary to the husband's trade or business, and not merely helpful thereto."

To the same effect are the following Tax Court decisions: John A. Guglielmetti, 35 T.C. 668 (1961); Ralph E. Duncan, 30 T.C. 386 (1958); L. L. Moorman, 26 T.C. 666 (1956); Edgar A. Basse, 10 T.C. 328 (1948); Frederick C. Moser, 18 T.C.M. 116 (1959).

As to these wives then, the relevant facts and circumstances tip the scales in another direction. The finding here is that what was being offered to these wives was primarily a pleasure trip and not education and training designed to further Acacia's business interests. Acacia's dominant purpose in making these trips available to wives of qualifying branch managers, unit managers and agents was to offer their husbands a prize or award for services performed. Therefore, the expenses attributable to these wives constitute wages to their hsubands under § 3401(a) upon which Acacia was required to withhold. Assessment and collection of the tax attributable to these wives was proper, and such amounts are not recoverable by Acacia in this action.

The parties have agreed that if (as this Court has found) Acacia is entitled to a judgment for a lesser amount than the full sum claimed, such amount shall be computed by the Internal Revenue Service and thereafter submitted to Acacia's representatives. Such computation should be made pursuant to the rulings contained in this opinion as to the different categories of Acacia's personnel and of their wives. Counsel will thereafter submit for entry an appropriate judgment.