## RUDOLPH et ux. *v.* UNITED STATES.

No. 396.  Argued April 3, 1962.—Decided June 18, 1962.

*Richard A. Freling* argued the cause for petitioners. With him on the briefs was *Felix Atwood.*

*John B. Jones, Jr.* argued the cause for the United States.  With him on the briefs were *Solicitor General Cox, Assistant Attorney General Oberdorfer, Wayne G. Barnett, I. Henry Kutz* and *Norman H. Wolfe.*

*Charles W. Merritt* filed a brief for the American Hotel Association, as *amicus curiae,* urging reversal.

PER CURIAM.

The petition for certiorari in this case was granted because it was thought to present important questions involving the definition of "income" and "ordinary and necessary" business expenses under the Internal Revenue Code.  368 U. S. 913.  An insurance company provided

a trip from its home office in Dallas, Texas, to New York City for a group of its agents and their wives. Rudolph and his wife were among the beneficiaries of this trip, and the Commissioner assessed its value to them as taxable income.* It appears to be agreed between the parties that the tax consequences of the trip turn upon the Rudolphs' "dominant motive and purpose" in taking the trip and the company's in offering it. In this regard the District Court, on a suit for a refund, found that the trip was provided by the company for "the primary purpose of affording a pleasure trip . . . in the nature of a bonus, reward, and compensation for a job well done" and that from the point of view of the Rudolphs it "was primarily a pleasure trip in the nature of a vacation . . . ." 189 F. Supp. 2, 4–5. The Court of Appeals approved these findings. 291 F. 2d 841. Such ultimate facts are subject to the "clearly erroneous" rule, cf. *Commissioner* v. *Duberstein,* 363 U. S. 278, 289–291 (1960), and their review would be of no importance save to the litigants themselves. The appropriate disposition in such a situation is to dismiss the writ as improvidently granted. See *Rice* v. *Sioux City Memorial Park Cemetery,* 349 U. S. 70, 78 n. 2 (1955).

Mr. Justice Frankfurter took no part in the decision of this case.

Mr. Justice White took no part in the consideration or decision of this case.

Separate opinion of Mr. Justice Harlan.

Although the reasons given by the Court for dismissing the writ as improvidently granted should have been persuasive against granting certiorari, now that the case is here I think it better to decide it, two members of the Court having dissented on the merits.

---

*A joint return had been filed.

The courts below concluded (1) that the value of this "all expense" trip to the company-sponsored insurance convention constituted "gross income" to the petitioners within the meaning of § 61 of the Internal Revenue Code of 1954, and (2) that the amount reflected was not deductible as an "ordinary and necessary" business expense under § 162 of the Code.[1] Both conclusions are, in my opinion, unassailable unless the findings of fact on which they rested are to be impeached by us as clearly erroneous. I do not think they can be on this record, especially in light of the "seasoned and wise rule of this Court" which "makes concurrent findings of two courts below final here in the absence of very exceptional showing of error." *Comstock* v. *Group of Institutional Investors*, 335 U. S. 211, 214.

The basic facts, found by the District Court, are as follows. Petitioners, husband and wife, reside in Dallas, Texas, where the home office of the husband's employer, the Southland Life Insurance Company, is located. By having sold a predetermined amount of insurance, the husband qualified to attend the company's convention in New York City in 1956 and, in line with company policy, to bring his wife with him. The petitioners, together with 150 other employees and officers of the insurance company and 141 wives, traveled to and from New York City on special trains, and were housed in a single hotel during their two-and-one-half-day visit. One morning was devoted to a "business meeting" and group luncheon, the rest of the time in New York City to "travel, sightseeing, entertainment, fellowship or free time." The entire trip lasted one week.

---

[1] As I see this case, there is no need to explore whether the proper reporting procedure for a *deductible* expense is not to include it in income in the first place, cf. Treas. Reg. § 1.162–17 (b), or to "run it through" the taxpayer's income with an offsetting deduction in the same amount.

The company paid all the expenses of the convention-trip which amounted to $80,000; petitioners' allocable share being $560. When petitioners did not include the latter amount in their joint income tax return, the Commissioner assessed a deficiency which was sustained by the District Court, 189 F. Supp. 2, and also by the Court of Appeals, one judge dissenting, in a *per curiam* opinion, 291 F. 2d 841, citing its recent decision in *Patterson* v. *Thomas,* 289 F. 2d 108, where the same result had been reached. The District Court held that the value of the trip being "in the nature of a bonus, reward, and compensation for a job well done," was income to Rudolph, but being "primarily a pleasure trip in the nature of a vacation," the costs were personal and nondeductible.

## I.

Under § 61 of the 1954 Code was the value of the trip to the taxpayer-husband properly includible in gross income? That section defines gross income as "all income from whatever source derived," including, among other items, "compensation for services." Certain sections of the 1954 Code enumerate particular receipts which are included in the concept of "gross income," [2] including prizes and awards (with certain exceptions); [3]

---

[2] *E. g.,* § 71 (Alimony and separate maintenance payments), § 72 (Annuities; certain proceeds of endowment and life insurance contracts), § 73 (Services of child).

[3] § 74: "(a) GENERAL RULE.—Except as provided in subsection (b) and in section 117 (relating to scholarships and fellowship grants), gross income includes amounts received as prizes and awards.

"(b) EXCEPTION.—Gross income does not include amounts received as prizes and awards made primarily in recognition of religious, charitable, scientific, educational, artistic, literary, or civic achievement, but only if—

"(1) the recipient was selected without any action on his part to enter the contest or proceeding; and

"(2) the recipient is not required to render substantial future services as a condition to receiving the prize or award."

while other sections, §§ 101–121, specifically exclude certain receipts from "gross income," including, for example, gifts and inheritances [4] (see *Commissioner* v. *Duberstein, 363 U. S. 278*), and meals or lodgings furnished for the convenience of the employer.[5] The Treasury Regulations emphasize the inclusiveness of the concept of "gross income." [6]

In light of the sweeping scope of § 61 taxing "all gains except those specifically exempted," *Commissioner* v. *Glenshaw Glass Co., 348 U. S. 426, 430*; see *Commissioner* v. *LoBue, 351 U. S. 243, 246*; *James* v. *United States, 366 U. S. 213, 219*, and its purpose to include as taxable income "any economic or financial benefit conferred on the employee as compensation, whatever the form or mode by which it is effected," *Commissioner* v. *Smith, 324 U. S. 177, 181*, it seems clear that the District Court's findings, if sustainable, bring the value of the trip within the reach of the statute.

Petitioners do not claim that the value of the trip is within one of the statutory exclusions from "gross income" (see notes 4 and 5, *supra*) as did the taxpayer in *Patterson* v. *Thomas, 289 F. 2d 108, 111–112*; rather they characterize the amount as a "fringe benefit" not specifically

---

[4] § 102.

[5] § 119. Some of the other exclusions are § 101 (Certain death payments), § 103 (Interest on certain governmental obligations), § 104 (Compensation for injuries or sickness), § 105 (Amounts received under accident and health plans), § 113 (Mustering-out payments for members of the Armed Forces), § 117 (Scholarship and fellowship grants).

[6] Treas. Reg. § 1.61–1 (a) provides:

"Gross income means all income from whatever source derived, unless excluded by law. Gross income includes income realized in any form, whether in money, property, or services. Income may be realized, therefore, in the form of services, meals, accommodations, stock, or other property, as well as in cash." See also Treas. Reg. § 1.61–2 (a)(1), (d) and § 1.74–1 (a).

excluded from § 61 by other sections of the statute, yet not intended to be encompassed by its reach. Conceding that the statutory exclusions from "gross income" are not exhaustive, as the Government seems to recognize is so under *Glenshaw*, it is not now necessary to explore the extent of any such nonstatutory exclusions.[7] For it was surely within the Commissioner's competence to consider as "gross income" a "reward, or a bonus given to . . . employees for excellence in service," which the District Court found was the employer's primary purpose in arranging this trip. I cannot say that this finding, confirmed as it has been by the Court of Appeals, is inadequately supported by this record.[8]

---

[7] Petitioners rely on § 3401 of the 1954 Code, relating to withholding taxes, and more especially on Treas. Reg. § 31.3401 (a)–1 (b) (10) providing that certain fringe benefits are not considered "wages" subject to withholding. The Government admits that not all "fringe benefits" have been taxed as income, but it is enough to point out here that the withholding tax analogy is not perfect, for payments to laid-off employees from company-financed supplemental unemployment benefit plans are "taxable income" to the employees although not "wages" subject to withholding. Rev. Rul. 56–249, 1956–1 Cum. Bull. 488, as amplified by Rev. Rul. 60–330, 1960–2 Cum. Bull. 46.

[8] The District Court said (189 F. Supp., at 4–5):

"All of the evidence considered, we think it irrefutably leads to this conclusion: That the insurance company was just doing a gracious magnanimous thing of awarding those leading agents a trip just as much as if it had awarded them an automobile, or suit of clothes . . . .

.    .    .    .    .

". . . [W]e conclude, that the trip was earned by . . . Rudolph, and was in the nature of a bonus, reward, and compensation for a job well done."

It is pertinent to note that in addition to the facts referred to on p. 271, *supra,* the record shows that company-sponsored conventions of the same kind have in recent years been held in Canada, Mexico City, Havana, Colorado and California, places well known for their appeal to tourists, and far removed from the home office in Dallas. While this factor alone does not render the expenses nondeductible, see I. R. S. News Rel. No. IR–394, August 3, 1961, it certainly was a relevant circumstance for the District Court to consider.

## II.

There remains the question whether, though income, this outlay for transportation, meals, and lodging was deductible by petitioners as an "ordinary and necessary" business expense under § 162.[9]  The relevant factors on this branch of the case are found in Treas. Reg. § 1.162–2.[10] In summary, the regulation in pertinent part provides:

Traveling expenses, including meals, lodgings and other incidentals, reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it are deductible, but expenses of a trip

---

[9] "(a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

.     .     .     .     .

"(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business . . . ."

No question is raised in this case as to whether the $80,000 paid by the company for the total convention expense is deductible by the corporation.

There is no need to explore the lack of symmetry in certain "income" and "deductibility" areas in the 1954 Code permitting employers to provide certain "fringe benefits" to employees—such as parking facilities, swimming pools, medical services—which have not generally been considered income to the employee, but which, if paid for by the employee with his own funds, would not be a deductible expense.  The practicalities of a tax system do not demand hypothetical or theoretical perfection, and these workaday problems are properly the concern of the Commissioner, not of the Courts.

[10] Although this Regulation is part of those promulgated on April 3, 1958, it is applicable to this 1956 transaction.  The power to make the Regulations prospective only, Int. Rev. Code of 1954, § 7805 (b), was not exercised, and they were made applicable to taxable years beginning after December 31, 1953.  T. D. 6291, 1958–1 Cum. Bull. 63.  Moreover, the result here would not be different under the prior comparable Regulation.  Treas. Reg. 118, § 39.23 (a)–2 (a).

"undertaken for other than business purposes" are "personal expenses" and the meals and lodgings are "living expenses." Treas. Reg. § 1.162–2 (a).

If a taxpayer who travels to a destination engages in both "business and personal activities," the traveling expenses are deductible only if the trip is "related primarily" to the taxpayer's business; if "primarily personal," the traveling expenses are not deductible even though the taxpayer engages in some business there; yet expenses allocable to the taxpayer's trade or business there are deductible even though the travel expenses to and fro are not.[11] *Id.*, § 1.162–2 (b)(1).

Whether a trip is related primarily to the taxpayer's business or is primarily personal in nature "depends on the facts and circumstances in each case." *Id.*, § 1.162–2 (b)(2); so too with expenses paid or incurred in attending a convention. *Id.*, § 1.162–2 (d).

Finally, the deductibility of the expenses of a taxpayer's wife who accompanies her husband depends, first, on whether his trip is a "business trip." *Id.*, § 1.162–2 (c); if so, it must further be shown that the wife's presence on the trip also had a bona fide business purpose. *Ibid.*

Where, as here, it may be arguable that the trip was both for business and personal reasons, the crucial question is whether, under all the facts and circumstances of the case, the purpose of the trip was "related primarily to business" or was, rather, "primarily personal in nature."

---

[11] No claim has been made by the husband in this case that specific business expenses which may have been incurred at the convention in New York are deductible. The only issue is the deductibility of the entire trip expense. Compare *Patterson* v. *Thomas*, 289 F. 2d 108, 114 and n. 13.

That other trips to other conventions or meetings by other taxpayers were held to be primarily related to business is of no relevance here; that certain doctors, lawyers, clergymen, insurance agents or others [12] have or have not been permitted similar deductions only shows that in the circumstances of those cases, the courts thought that the expenses were or were not deductible as "related primarily to business."

The husband places great emphasis on the fact that he is an entrapped "organization man," required to attend such conventions, and that his future promotions depend on his presence. Suffice it to say that the District Court did not find any element of compulsion; to the contrary, it found that the petitioners regarded the convention in New York City as a pleasure trip in the nature of a vacation. Again, I cannot say that these findings are without adequate evidentiary support. *Supra,* pp. 273–274.

The trip not having been primarily a business trip, the wife's expenses are not deductible. It is not necessary, therefore, to examine whether they would or would not be deductible if, to the contrary, the husband's trip was related primarily to business.

Where, as here, two courts below have resolved the determinative factual issues against the taxpayers, according to the rules of law set forth in the statute and regu-

---

[12] Deductions allowed: *Coffey* v. *Commissioner,* 21 B. T. A. 1242 (doctor); *Coughlin* v. *Commissioner,* 203 F. 2d 307 (lawyer); *Shutter* v. *Commissioner,* 2 B. T. A. 23 (clergyman); *Callinan* v. *Commissioner,* 12 T. C. M. 170 (legal secretary); see Rev. Rul. 59–316, 1959–2 Cum. Bull. 57; Rev. Rul. 60–16, 1960–1 Cum. Bull. 58.

Deductions not allowed: *Duncan* v. *Commissioner,* 30 T. C. 386 (doctor); *Ellis* v. *Burnet,* 60 App. D. C. 193, 50 F. 2d 343 (lawyer); *Reed* v. *Commissioner,* 35 T. C. 199 (lawyer); *Patterson* v. *Thomas,* 289 F. 2d 108 (insurance agent); *Russell* v. *Commissioner,* 11 T. C. M. 334 (railroad fireman).

lations, it is not for this Court to re-examine the evidence, and disturb their findings, unless "clearly erroneous." That is not the situation here.

I would affirm.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK joins, dissenting.

## I.

It could not, I think, be seriously contended that a professional man, say a Senator or a Congressman, who attends a convention to read a paper or conduct a seminar *with all expenses paid* has received "income" within the meaning of the Internal Revenue Code. Nor would it matter, I assume, that he took his wife and that her expenses were also paid. Income has the connotation of something other than the mere payment of expenses. The statute, 26 U. S. C. § 61, speaks in terms of financial gain, of compensation for services, "including fees, commissions, and similar items." The form of payment for services covers a wide range. Treasury Regulations § 1.61–1 provide:

> "Gross income includes income realized in any form, whether in money, property, or services. Income may be realized, therefore, in the form of services, meals, accommodations, stock, or other property, as well as in cash."

The formula "all expenses paid" might be the disguise whereby compensation "for services" is paid. Yet it would be a rare case indeed where one could conclude that a person who gets only his expenses for attendance at one convention gets "income" in the statutory sense. If this arrangement were regular and frequent or if it had the earmarks of a sham device as a cloak for remuneration, there would be room for fact-finders to conclude that

it was evasive. But isolated engagements of the kind here in question have no rational connection with compensation "for services" rendered.

It is true that petitioner was an employee and that the expenses for attending the convention were paid by his employer. He qualified to attend the convention by selling an amount of insurance that met a quota set by the company. Other salesmen also qualified, some attending and some not attending. They went from Dallas, Texas, to New York City, where they stayed two and a half days. One day was given to a business session and a luncheon; the rest of the time was left for social events.

On this record there is no room for a finding of fact that the "expenses paid" were "for services" rendered. They were apparently a proper income tax deduction for the employer. The record is replete with evidence that from management's point of view it was good business to spend money on a convention for its leading agents—a convention that not only kept the group together in New York City, but in transit as well, giving ample time for group discussions, exchanges of experience, and educational training. It was the exigencies of the employment that gave rise to the convention. There was nothing dishonest, illegitimate, or unethical about this transaction. No services were rendered. New York City may or may not have been attractive to the agents and their wives. Whether a person enjoys or dislikes the trip that he makes "with all expenses paid" has no more to do with whether the expenses paid were compensation "for services" rendered than does his attitude toward his job.

In popular understanding a trip to a convention "with all expenses paid" may be an award. Yet the tax laws are filled with exemptions for "awards" which are not considered to be income. The exemption of gifts is one example. Others are the exemptions of the proceeds

of life insurance payable at death, disability benefits, the rental values of parsonages, scholarship and fellowship grants, allowances of U. S. employees abroad, mustering-out payments to members of the Armed Forces, etc. Employees may receive from their employers many fringe benefits that are not income. Treasury Regulations § 31.3401 (a)–1 (b)(10) provide:

> "Ordinarily, facilities or privileges (such as entertainment, medical services, or so-called 'courtesy' discounts on purchases), furnished or offered by an employer to his employees generally, are not considered as wages subject to withholding if such facilities or privileges are of relatively small value and are offered or furnished by the employer merely as a means of promoting the health, good will, contentment, or efficiency of his employees."

The fringe benefits of this one convention trip are less obviously income than the fringe benefits listed in the Regulations. For the latter are constantly recurring—day after day, week after week. Moreover, on this record the convention promotes the "efficiency" of the agents as much as the other fringe benefits enumerated in the Regulations.

## II.

The expenses, if "income," are plainly deductible. The Government, however, says that our problem is to determine "whether it is consistent with the ends of an equitable and workable tax system" to make them such. The problem of designing an "equitable" tax system is, however, for Congress, not for the Court.

The test of deductibility to be applied here is whether the expenses are "ordinary and necessary" in the carrying on of petitioner's business. The Act is explicit in permitting the deduction of traveling expenses (including the

entire amount expended for meals and lodging) while away from home in the "pursuit of a trade or business," 26 U. S. C. § 162 (a)(2).

The Regulations are even more explicit. Section 1.162–2 (b)(1) provides:

> "If a taxpayer travels to a destination and while at such destination *engages in both business and personal activities,* traveling expenses to and from such destination are deductible only if the trip is related *primarily* to the taxpayer's trade or business. If the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible even though the taxpayer engages in business activities while at such destination." (Italics added.)

Thus, by the very terms of the Regulations a taxpayer who combines business and pleasure may deduct all "traveling expenses," provided the business purpose is dominant.

Section 1.162–2 (b)(2) of the Regulations states:

> "Whether a trip is related primarily to the taxpayer's trade or business or is primarily personal in nature depends on the facts and circumstances in each case. The amount of time during the period of the trip which is spent on personal activity compared to the amount of time spent on activities directly relating to the taxpayer's trade or business is an important factor in determining whether the trip is primarily personal. If, for example, a taxpayer spends one week while at a destination on activities which are directly related to his trade or business and subsequently spends an additional five weeks for vacation or other personal activities, the trip will be considered primarily personal in nature in the absence of a clear showing to the contrary."

Where, as here, at least one-half of the time is spent on mundane "business" activities,[1] the case is nowhere near the colorable transaction described in § 1.162-2 (b)(2).

I see no reason to take this case out of the main stream of precedents and establish a special rule for insurance conventions. Judge Brown, dissenting in the Court of Appeals, shows how discriminatory this decision is:

> "Deductions have been allowed as 'ordinary and necessary' to clergymen attending a church convention; to expenses of an employee attending conventions of a related business group; to a lawyer attending a meeting of the American Bar Association; to a legal secretary attending the national convention of the National Association; to physicians attending medical conventions; to certified public accountants attending conventions; to university teachers in attending conventions or scientific meetings; to professional cartoonists attending political conventions; to persons attending the Red Cross Convention; to school teachers attending summer school; to attorneys attending an institute on Federal taxation; to employees sent to refresher courses to become more acquainted with new processes in the industry; to a furniture store sending its buyers to the annual furniture mart; to representatives to annual conventions of trade associations; and to an insurance agent away from home on business." 291 F. 2d 841, 844-845.

Insurance conventions go back at least to 1924 (Report No. 15, Life Insurance Sales Research Bureau, Nov. 1924) and are premised on the idea that agents and companies

---

[1] The travel to and from the convention was in a group, so arranged as to develop solidarity among the agents, and to provide a continuing seminar.

benefit from the knowledge and increase in morale which result from them.[2]   Why they should be treated differently from other conventions is a mystery.   It cannot be, as the district judge thought and as the Government seems to argue, because going to New York City is, as a matter of law, a "pleasure trip."   If we are in the field of judicial notice, I would think that some might conclude that the weekend in New York City was a chore and that those who went sacrificed valuable time that might better have

[2] "One of the chief things to be accomplished by a convention is to secure unanimous understanding of the principles underlying the company's sales operations and the rules which experience has proved to be essential in carrying out those principles.   There is no sales organization anywhere which has a complete and unanimous grasp of these matters but a convention can do more to give the men that grasp than anything else.   Home Offices are constantly under the necessity of formulating principles and rules, and they are similarly in a constant state of disappointment because they are not understood.   The convention is the place above all others where this can be accomplished.

.                 .                 .                 .                 .

"The extent to which the Home Office arranges for transportation depends largely upon the situation of the convention city.   If it is centrally located with many lines of approach, it would be impracticable to arrange for many men to meet on their way to the convention.   But if the convention is to be held in an isolated spot, or one at considerable distance from the home of the majority of the members attending, then specific plans may be made for assembling at some nearer location and proceeding together to the destination.   If this latter is at all feasible, it is desirable for several reasons.   It gives the men a peculiar feeling of satisfaction to travel on a 'special' train or on 'special' cars, it encourages a friendlier feeling than is generally present at conventions at which the men arrive as strangers, it makes the men more anxious to get down to the real work of the convention when they arrive at their destination, and, above all, it has a decided educational value in its contacts and ever present business discussions."   Report No. 15, Life Insurance Sales Research Bureau, Nov. 1924, pp. 13, 17–18.

been spent on the farm, in the woods, or along the seashore.

Moreover, federal revenue agents attending their convention are given a deduction for the expenses they incur. We are advised that

". . . the Commissioner has recently withdrawn his objections in two Tax Court cases to the deduction of convention expenses incurred by two IRS employees in attending conventions of the National Association of Internal Revenue Employees.

"No explanation has been given publicly for the Tax Court action of the Commissioner, it being generally presumed that the IRS employees met the tests of Reg. § 1.162–2 (d) by showing a sufficient relationship between the trade or business of being an IRS employee and attendance at conventions of the NAIRE. The National Association of Internal Revenue Employees has hailed the Commissioner's actions as setting a precedent which can be cited by IRS employees when taking deductions for expenses incurred in attending NAIRE conventions." CCH Standard Federal Tax Reports No. 23, April 19, 1961, pt. 1, p. 2.

It is odd, indeed, that revenue agents need make no accounting of the movies they saw or the nightclubs they attended, in order to get the deduction, while insurance agents must.

## III.

The wife's expenses [3] are, on this record, also deductible. The Treasury Regulations state in § 1.162–2 (c):

"Where a taxpayer's wife accompanies him on a business trip, expenses attributable to her travel are

---

[3] For reasons not germane to the problems of the federal income tax, the New York Superintendent of Insurance has ruled that the payment of a wife's expenses in attending an insurance convention

not deductible unless it can be adequately shown that the wife's presence on the trip has a bona fide business purpose. The wife's performance of some incidental service does not cause her expenses to qualify as deductible business expenses. The same rules apply to any other members of the taxpayer's family who accompany him on such a trip."

The civil law philosophy, expressed in the community property concept, attributes half of the husband's earnings to the wife—an equitable idea that at long last was reflected in the idea of income splitting under the federal income tax law.[4] The wife's contribution to the business productivity of the husband in at least some activities is well known. It was specially recognized in the insurance field long before the issue of deductibility of her expenses arose under the federal income tax.[5] Business reasons

---

is not permissible. N. Y. Ins. Dept. Rulings (1953), Oct. 6, 1953. And see 27 McKinney's Con. Laws of N. Y., § 213, subdivisions 7 and 8, regulating insurance agents' competitions.

[4] See H. R. Rep. No. 1274, 80th Cong., 2d Sess., pp. 1, 47.

[5] "Today an ever increasing number of wives take a real interest in what their husbands do, and this interest is frequently referred to by men as being of very great value to them. In fact, it has been said that a wife can not usually be so wholly lacking in contact with her husband's work as to have no influence at all upon it.

"In many cases, this influence is negative rather than positive, and this is particularly true in the careers of many life insurance agents because their work frequently involves evening appointments—a condition usually resented by a wife. Many a wife has thoroughly discouraged her husband because the only thing which she ever knew about his work was that he had to go out at night or that he had failed to 'write that ten' which would give her a new dress. She knew nothing about the bigger things which life insurance accomplishes and of which her husband was or could be a part. The recognition of the very great desirability of 'selling' the wife on her husband's job has spread rapidly in recent years, and today many husbands are helped over the rough spots of their career by the enthusiasm and vision of their wives, much of which can be aroused or increased at a convention." Report No. 15, *supra* note 2, pp. 25–26.

motivated the inclusion of wives in this particular insurance convention. An insurance executive testified at this trial:

"Q. I hand you Plaintiff's Exhibit 15, and you will notice it is a letter addressed to 'John Doe'; also a bulletin entitled 'A New Partner Has Been Formed.'

"Will you tell us what that consists of?

"A. This is a letter addressed to the wife of an agent, a new agent, as we make the contract with him. This letter is sent to his wife within a few days after the contract, enclosing this booklet explaining to her how she can help her husband in the life insurance business.

.      .      .      .      .

"Q. Please tell us, as briefly as you can and yet in detail, how you as agency director for Southland attempt to integrate the wives' performance with the performance of agents in the life insurance business.

"A. One of the important functions we have in mind is the attendance at these conventions. In addition to that communication, occasionally there are letters that will be written to the wife concerning any special sales effort that might be desired or promoted. The company has a monthly publication for the agents and employees that is mailed to their homes so the wife will have a convenient opportunity to see the magazine and read it.

"At most of our convention program[s], we have some specific reference to the wife's work, and in quite a few of the convention programs we have had wives appear on the program.

"Q. Suppose you didn't have the wives and didn't seek to require their attendance at a convention, would there be some danger that your meetings

and conventions would kind of degenerate into stag affairs, where the whole purpose of the meeting would be lost?

"A. I think that would definitely be a tendency."

I would reverse the judgments below and leave insurance conventions in the same category as conventions of revenue agents, lawyers, doctors, business men, accountants, nurses, clergymen and all others, until and unless Congress decides otherwise.