T.C. Summary Opinion 2009-17

UNITED STATES TAX COURT

JOSEPH H. SCHENKER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5755-07S.                    Filed January 29, 2009.

Joseph H. Schenker, pro se.

<u>Elizabeth Martini</u>, for respondent.

GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code (Code) in

effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue for decision is whether petitioner was engaged in a trade or business during 2003, 2004, and 2005 which would allow him to deduct expenses claimed on Schedule C, Profit or Loss From Business, for these years. If petitioner was not engaged in a trade or business, then a second issue for decision arises as to whether petitioner is entitled to deduct those expenses under any other provisions of the Code.

Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in New York State when he filed his petition.

After graduating from the Talmudical Academy of Baltimore, Maryland, petitioner studied at and received his rabbinical ordination from Hebron Yeshiva Knesset Israel (Hebron Yeshiva) in Jerusalem, Israel.[1] A yeshiva is a rabbinical seminary.

_____

[1]The prestigious Hebron (spelled alternately as Hevron or Chevron on many documents depending on the translation from Hebrew to English) Yeshiva originated in the 1800s in Slabodka, Lithuania. Following the tumultuous aftermath of World War I, the yeshiva relocated to Hebron in Palestine, which was then under a British Mandate. In August 1929 many members of the Hebron Jewish community, including teachers and students of the yeshiva, were killed in a massacre. The yeshiva resettled in the Geula section of Jerusalem and formally renamed the school the "Hebron Yeshiva Knesset Israel" in memory of the students and
(continued...)

Petitioner returned to the United States, where he earned a bachelor's degree in economics from Queens College in New York and a master's degree in educational research from City College in New York. Following a brief stint as a Talmud teacher at a yeshiva in Miami, Florida, petitioner returned to the City College of New York, where he worked for many years in the educational research field. Then he rejoined the Talmudical Academy of Baltimore as a fundraiser.

On or about August 29, 1988, petitioner signed an employment contract with Rabbi Chevroni, the administrator of Givat Mordechai. The contract called for petitioner to serve a 6-month trial period starting September 1, 1988, as full-time executive director of Hebron Yeshiva's New York City office. The New York office has the official name "American Friends of Hebron Yeshiva in Jerusalem, Inc." (American Friends). The contract stated that petitioner's official title was "President of the Friends of the Yeshiva in America", and that his principal responsibilities were to oversee office functions such as collection, donor mailing lists, and bookkeeping and to raise funds from supporters in the

---

[1](...continued)
teachers who died there. Because of its location, the yeshiva became known as Hebron Yeshiva Geula (Geula). Because of its growth, around 1975 Hebron Yeshiva opened a second, more spacious location in the Givat Mordechai section of Jerusalem. This second location became known as Hebron Yeshiva Givat Mordechai (Givat Mordechai) and left Hebron Yeshiva with two branches, Geula and Givat Mordechai, operating under one charter.

United States and Canada. The pay was $45,000 per year. Petitioner, in addition to his salary, was to receive 15 percent of all income arising from new contributors to the Yeshiva that he brought in personally. The percentage was reduced to 10 percent if the contributor earmarked the donation for the building fund and gave more than $100,000.

Earlier, two American sisters from Titusville, Pennsylvania, Rebecca and Mirrel Davis, created sizable charitable trusts through their wills. Each sister directed that Hebron Yeshiva was to receive 19 percent of the trust's annual income. Petitioner learned of the sisters' trusts through his position with American Friends.

After Hebron Yeshiva established a second campus, Givat Mordechai's enrollment grew rapidly. The record is not clear about the ensuing events, but it appears that the leader of Geula, Rabbi Sarna, and the leader of Givat Mordechai, Rabbi Chevroni, had a dispute. Rabbi Sarna and Rabbi Chevroni tried to find a solution, but eventually, they went to a religious court to resolve the matter. Apparently, the religious court suggested that they dissolve the unified charter, operate under separate names, and seek civil arbitration to divide the assets and income.

In November 1990 for unknown reasons Rabbi Chevroni terminated petitioner's job with American Friends. Petitioner,

with his knowledge as the former director, approached Rabbi Sarna and offered to provide information that might be valuable in the arbitration. On or about December 26, 1990, petitioner signed a contract drafted by Rabbi Sarna. The contract stated that petitioner would have available certain information related to American Friends' assets, donor mailing lists, and transfers to Hebron Yeshiva.

As compensation for the information, the contract called for petitioner to receive one of three percentages depending on the reaction of Rabbi Chevroni to Rabbi Sarna's contract with petitioner. If the contract caused Rabbi Chevroni to provide previously undisclosed information to the arbitrator, then petitioner would receive 15 percent of the amount that Geula received over 5 years as a result of the arbitrator's decision. However, if Rabbi Chevroni was not forthcoming and Rabbi Sarna needed petitioner's information, then petitioner's percentage would be 30 percent. Finally, if Rabbi Chevroni offered Geula a fixed annual payment and Geula did not need to contact the donors on the American Friends' mailing lists, then petitioner's percentage would be one-third. The contract also provided that if Rabbi Sarna and petitioner were to have any other joint projects in the future, then at that time they would agree on petitioner's compensation for such cooperation.

It turned out that Rabbi Sarna did need and petitioner did furnish valuable information, such as donor lists and funding figures from American Friends. Apparently, at some point afterwards the leadership of the two branches formally dissolved the parent corporation through Israel's Registrar of Corporations and officially established two separate entities: "Hebron Yeshiva Guela" and "Hebron Yeshiva Knesset Israel--Givat Mordechai". The leaders also apparently agreed to divide donations and perhaps certain assets, in a ratio of 70 percent to Givat Mordechai and 30 percent to Geula.

Petitioner, who was living in Brooklyn and who was now out of a job, tried his hand as an independent mortgage broker. In 1990 he paid $5,200 to buy a one-bedroom cooperative (co-op) apartment on the Upper West Side of Manhattan. Around 1994 petitioner also entered into an oral agreement with Rabbi Sarna to raise funds for Geula in exchange for one-third of the donations he generated. On occasion, petitioner would meet with mortgage clients and fundraising donors at the co-op apartment, but more often he would go to the client's or donor's location. He would also call donors and read the New York Times for leads. Intermittently, Rabbi Sarna would visit the United States, sometimes for up to 6 to 7 weeks to meet with people and help with fundraising. Very often on these visits Rabbi Sarna would stay at petitioner's co-op apartment. Petitioner did not charge

him rent.  Apparently, at some point petitioner began to include a Schedule C with his annual income tax return to claim business deductions for expenses related to his mortgage activities, fundraising efforts, and co-op apartment.

In 1998 petitioner began working full time for the New York City Department of Finance, where he continues to work full time to date.  Even though petitioner's mortgage efforts ended sometime during the first half of 2003, petitioner continued to deduct apartment and other expenses on Schedules C through the end of 2005.  He did not list a business name, principal activity, or business code on the Schedules C.  Petitioner generated donations to Geula of about $40,000, $25,000, and zero in 2003, 2004, and 2005, respectively.  In 2003 petitioner traveled to and stayed in Israel for 13 days, during which time he met with Rabbi Sarna and other leaders at Geula to discuss fundraising.  Petitioner deducted the cost of the trip on the 2003 Schedule C.

By this time, unfortunately for petitioner, he still had not received a penny from Geula, either under the contract or for his subsequent fundraising activities.  Petitioner did not press his claim because he assumed the payments would be forthcoming after Geula started receiving funds under the agreement to split income 30/70 with Givat Mordechai.  However, in 2003 Rabbi Sarna indicated to petitioner that Geula would not pay him for prior

years.  In February 2004 petitioner traveled again to Israel, this time staying for 12 days.  He confronted Rabbi Sarna regarding payment under the contract.  Petitioner received no payment or commitment from Rabbi Sarna.  As a consequence, before returning home petitioner met with and engaged an Israeli law firm to sue Geula and Rabbi Sarna.  Petitioner deducted the travel expenses related to the 2004 trip on Schedule C.

After returning to New York, petitioner continued to fundraise intermittently for Guela because he wanted to maintain his relationship with the institution during the litigation.  However, petitioner stopped fundraising completely by the spring of 2005, and in late October 2005 petitioner moved out of Brooklyn and into the co-op apartment.  After October 2005 petitioner stopped claiming Schedule C deductions for apartment expenses.

In May 2007 the initial phase of his Israeli litigation concluded when the District Court of Jerusalem, Israel, ruled that petitioner was entitled to receive 7 percent of the sums that Geula was to receive over a 5-year period from Givat Mordechai.  Because petitioner was dissatisfied with the judicial decision of what he believed was an unfairly low percentage, he appealed to the Israeli Supreme Court.

Around December 2007 a few days after a pretrial conference with a justice of the Israeli Supreme Court, petitioner and Rabbi

Sarna reached a settlement. They agreed petitioner is to receive "12 percent of all monies from the Sisters' Fund to be obtained by Hebron Yeshiva Geula, dating on a yearly basis, back to 1986 and from the date the first monies are received for the next 5 years--22.5 percent". From 1986 to 2003 Givat Mordechai received about $10 million in donations through American Friends, of which it owes Geula about $3 million.

The record is not clear as to the source of the donations and whether the percentages in the settlement refer solely to donations from the sisters' trusts or to all funds Geula is to receive from Givat Mordechai. Before the settlement, petitioner's Israeli attorney estimated petitioner could receive a judgment between $200,000 to $250,000. After the settlement petitioner estimated Geula owed him more than $400,000. Through the date of trial in February 2008 petitioner still had not received any payment from Geula.

Petitioner timely filed his 2003 through 2005 Federal income tax returns. He reported the following taxable income:

|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Wages | $57,409 | $67,925 | $71,382 |
| State tax refund | 2,039 | 4,295 | 3,258 |
| Business income/(loss) | (36,509) | (27,373) | (26,327) |
| Pension distribution | 1,731 | 1,303 | 1,700 |
| Adjusted gross income | 24,670 | 46,150 | 50,013 |
| Itemized deductions | 7,973 | 10,159 | 9,853 |
| Personal exemption | 3,050 | 3,100 | 3,200 |
| Taxable income | 13,647 | 32,891 | 36,960 |

The detail for each Schedule C, is as follows:

|                                  | 2003      | 2004      | 2005      |
|----------------------------------|-----------|-----------|-----------|
| Income                           | -0-       | -0-       | -0-       |
| expenses:                        |           |           |           |
| Advertising                      | $300      | -0-       | -0-       |
| Legal fees                       | -0-       | $6,000    | $7,800    |
| Medical expenses                 | 2,870     | -0-       | 3,212     |
| Mortgage interest                | 254       | 183       | 172       |
| NYCERS pension buyback           | 18,456    | -0-       | 2,380     |
| Real estate taxes                | 823       | -0-       | 642       |
| Travel                           | 1,740     | 1,650     | -0-       |
| Other expenses:                  | N/A       | [1]2,774  | N/A       |
|   Apt. maintenance fees          | 9,544     | 9,544     | 10,470    |
|   Newspapers, magazines          | 340       | N/A       | -0-       |
|   Telephone                      | 1,483     | N/A       | 652       |
| Petitioner discrepancy[2]        | 699       | 7,222     | 999       |
| Profit/(loss)                    | (36,509)  | (27,373)  | (26,327)  |

[1]For 2004 the Court received a transcript of petitioner's account instead of a tax return. As a result, no breakout was available of petitioner's "Other expenses", which the transcript reported as $12,318. However, the stipulation of facts states that petitioner deducted $9,544 in apartment maintenance fees, leaving $2,774 as "Other expenses".

[2]Petitioner prepared his tax returns manually. In each year the sum of the individual expenses did not add up to and were less than the total amount of expenses that petitioner reported on Schedule C. Petitioner did not explain the discrepancies.

Respondent audited petitioner's tax returns for 2003 through 2005 and determined that petitioner's fundraising and other activities did not rise to the level of an active trade or business. Consequently, respondent disallowed petitioner's Schedule C deductions. Respondent, however, allowed petitioner's

deductions for mortgage interest and real estate taxes on Schedule A, Itemized Deductions.

As a result of all of the above adjustments, respondent issued a notice of deficiency dated December 15, 2006, determining deficiencies of $7,410, $6,638, and $6,375 in petitioner's Federal income taxes for 2003, 2004, and 2005, respectively.[2]  Petitioner timely petitioned this Court seeking allowance of his Schedule C deductions.

## Discussion

In general, the Commissioner's determination set forth in a notice of deficiency is presumed correct, and the taxpayer bears the burden of showing that the determination is in error.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Under section 7491(a), a taxpayer may shift the burden to the Commissioner regarding factual matters if the taxpayer produces credible evidence and meets the other requirements of the section.  Petitioner has not raised the burden of proof as an issue, and therefore, the burden remains with petitioner.

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to a deduction.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440

---

[2]The Court rounded all dollar amounts in this opinion to the nearest dollar.

(1934).  Section 6001 requires taxpayers to maintain records sufficient to establish the amount of each deduction.  See also sec. 1.6001-1(a), (e), Income Tax Regs.  Taxpayers may deduct only the business expenses that they can substantiate.  Ronnen v. Commissioner, 90 T.C. 74, 102 (1988).

A taxpayer may deduct ordinary and necessary expenses that he pays in connection with the operation of a trade or business.  Sec. 162(a); Boyd v. Commissioner, 122 T.C. 305, 313 (2004).  To be "ordinary" the expense must be of a common or frequent occurrence in the type of business involved.  Deputy v. du Pont, 308 U.S. 488, 495 (1940).  To be "necessary" an expense must be "appropriate and helpful" to the taxpayer's business.  Welch v. Helvering, supra at 113.  Additionally, the expenditure must be "directly connected with or pertaining to the taxpayer's trade or business".  Sec. 1.162-1(a), Income Tax Regs.  Section 262(a) disallows deductions for personal, living, or family expenses.

If a taxpayer establishes that an expense is deductible but is unable to substantiate the precise amount, we may estimate the amount, bearing heavily against the taxpayer whose inexactitude is of his own making.  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).  However, the taxpayer must present sufficient evidence for the Court to form an estimate because without such a basis, any allowance would amount to unguided

largesse.  Williams v. United States, 245 F.2d 559, 560-561 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

I.  Whether Petitioner Was Engaged in a Trade or Business

Respondent determined that petitioner was not engaged in fundraising or any other activity sufficient to qualify the expenses for 2003, 2004, and 2005 as section 162 business deductions on Schedule C.

To be engaged in a trade or business within the meaning of section 162(a), an individual taxpayer must be involved in the activity with continuity and regularity, and with the primary purpose of deriving a profit.  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Ranciato v. Commissioner, 52 F.3d 23, 25 (2d Cir. 1995), vacating and remanding T.C. Memo. 1993-536.  Whether the taxpayer is carrying on a trade or business requires an examination of all of the facts and circumstances in each case. Commissioner v. Groetzinger, supra at 36; Ranciato v. Commissioner, supra at 25.

Although a reasonable expectation of a profit is not required, the taxpayer's profit objective must be actual and honest.  Ranciato v. Commissioner, supra at 25; Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  Whether a taxpayer has an actual and honest profit objective is a question of fact to be answered from

all of the relevant facts and circumstances.  Ranciato v. Commissioner, supra at 26.  Hastings v. Commissioner, T.C. Memo. 2002-310; sec. 1.183-2(a), Income Tax Regs.

The pertinent regulations set forth a nonexhaustive list of factors that may be considered in deciding whether a profit objective exists.  These factors include:  (1) The manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisers, (3) the time and effort the taxpayer expended in carrying on the activity, (4) the taxpayer's expectation that assets he used in the activity would appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which the taxpayer earned, (8) the financial status of the taxpayer, and (9) the elements of personal pleasure or recreation.  Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.  No single factor or group of factors is determinative.  Golanty v. Commissioner, supra at 426.  A final determination is made only after a consideration of all of the relevant facts and circumstances.

Sometime during the first half of 2003 petitioner ended his mortgage brokerage activity.  He did not receive any income from

the mortgage business during the years in dispute. Therefore at the outset we conclude on the basis of the above factors that petitioner was not in the trade or business of being a mortgage broker during the years at issue.

Petitioner's fundraising activities require greater analysis. Petitioner received no payments for his fundraising efforts during 2003, 2004, or 2005. Petitioner spent the bulk of his working hours maintaining his full-time job with the city. In 2003 petitioner's fundraising efforts were infrequent and petitioner did not conduct his efforts with the continuity or regularity that section 162 requires. Petitioner curtailed his fundraising activities even further after February 2004 when he started suing Geula and Rabbi Sarna, and he ceased fundraising entirely by spring 2005. Importantly, the law holds that a sporadic activity does not qualify as a trade or business. Commissioner v. Groetzinger, supra at 35.

Petitioner has not established a profit objective for his fundraising activity on behalf of Geula. We observe that petitioner did not receive any payment for his efforts during the years at issue and that he did not conduct the activity on a regular basis. Further, petitioner, as a rabbi, may find it a righteous deed to help Jewish causes and raise funds for his alma mater. Likewise, petitioner's efforts in trying to gain payment from the contract was not an ongoing trade or business within the

meaning of section 162 but rather was an activity that fits well under the definition of section 212 as an endeavor petitioner pursued for the collection of income due him.

For all the foregoing reasons, we hold that petitioner's fundraising activity was not a trade or business during 2003 through 2005. Although petitioner may not deduct his expenses as section 162 trade or business expenses on Schedule C, other sections allow deductions for some of the expenses as itemized deductions on Schedule A. We now discuss each of the disputed expenses.

II. Deductibility of Expenses

A. Advertising

Petitioner sent a $300 check dated April 16, 2003, to his synagogue in New York to display the name of his mortgage business in an advertising brochure printed for the synagogue. Instead, the synagogue listed petitioner's personal name on a one-page "Scroll of Honor" for a June 2003 luncheon. Petitioner deducted the $300 on Schedule C in 2003 as an advertising expense.

Because we have already concluded that petitioner was not in the trade or business of mortgage brokering during 2003, he may not deduct the payment as an "above the line" advertising expense. Similarly, because petitioner did not write the check with detached and disinterested generosity, the payment is not

deductible as a Schedule A charitable contribution. See <u>Sklar v.</u> <u>Commissioner</u>, 125 T.C. 281, 291-292 (2005), affd. 549 F.3d 1252 (9th Cir. 2008). If petitioner had received any income from his mortgage activity, he would have had to report the income. Therefore, petitioner may deduct the $300 as a section 212 miscellaneous itemized deduction incurred for the production of income subject to the 2-percent floor that section 67(a) imposes on section 212 expenses.

B. <u>Legal Fees</u>

Petitioner deducted $6,000 and $7,800 for 2004 and 2005, respectively, on Schedules C for payments to an Israeli law firm. Petitioner had engaged the firm to press his legal claim against Geula and Rabbi Sarna for payment under the contract. Petitioner's only substantiation for the expenses was a letter from the Israeli law firm stating that pertaining to the litigation, petitioner paid $7,000 in 2004 and $5,800 in 2005.

Because petitioner's litigation expenses arose from a contract right generating income, he may deduct the legal fees under section 212(1) as miscellaneous itemized deductions incurred for the production or collection of income. See <u>United</u> <u>States v. Gilmore</u>, 372 U.S. 39, 48 (1963); <u>Commissioner v.</u> <u>Doering</u>, 335 F.2d 738, 741 (2d Cir. 1964), affg. 39 T.C. 647 (1963). Respondent acknowledged that petitioner's legal fees are

deductible under section 212 but disallowed the deduction because petitioner did not substantiate the fees.

We find the law firm's letter to be credible evidence, and therefore we hold that petitioner may deduct the legal fees the law firm reported, subject to the 2-percent limitation that section 67(a) imposes on section 212 expenses. See Knight v. Commissioner, 552 U.S. __, __, 128 S. Ct. 782, 785 (2008); sec. 1.67-1T(a)(1)(ii) and (2), Temporary Income Tax Regs., 53 Fed. Reg. 9875 (Mar. 28, 1988).

C.  Medical Expenses

Petitioner deducted $2,870 and $3,212 for 2003 and 2005, respectively, on Schedules C for medical expenses. He may have also claimed medical expenses in 2004 on Schedule C which respondent's transcript may have included in "Other Expenses", or which petitioner may have included as part of the discrepancy in adding up his total expenses.

Section 213 permits a deduction for medical expenses that taxpayers incur and which insurance does not cover, but only to the extent that the expenses exceed 7.5 percent of the taxpayer's adjusted gross income. Further, section 1.213-1(h), Income Tax Regs., requires taxpayers to substantiate their medical expenses by providing the names and addresses of the persons or organizations to whom they made payment and the amounts and dates of the payments.

We have some leeway because of <u>Cohan v. Commissioner</u>, 39 F.2d 543-544 (2d Cir. 1930).  However, petitioner has not provided doctors' invoices, printouts from pharmacies, or any other evidence from which we can form a reasonable estimate of the expenses he paid.  Moreover, petitioner would have to establish that his payments went for qualifying medical expenses and that insurance did not cover or reimburse the payments.  For the foregoing reasons, petitioner may not deduct medical expenses for 2003, 2004, or 2005.

D.  <u>NYCERS Pension Buyback</u>

During 2003 and 2005 petitioner paid $18,456 and $2,380, respectively, to "buy back" pension credits with the New York City Employee Retirement System (NYCERS).  The buy back program is an option for NYCERS members who previously worked for a public employer within New York State and who at that time did not participate in NYCERS.  Eligible members may buy pension credits in NYCERS for their prior State employment.  Petitioner funded his buy backs by writing a $16,784 check in 2003 and by paying for the remaining 2003 and 2005 buy backs through payroll withholdings.

Petitioner makes two arguments to support the validity of the deductions.  First, petitioner contends that his payments should qualify as deductible employer contributions.  However, as noted above, petitioner has not established that he was operating

a business during 2003 through 2005; and further, he made the contributions as an employee of New York City, not as an employer.

Secondly, petitioner contends that the combination of the following two sentences in NYCERS's brochure Buy Back No. 901, at 2, disallows a deduction only when an employee pays for the buy back through payroll withholdings: (1) "Members generally have three options to purchase <u>Previous Service</u>: lump sum, payroll deductions, or roll over funds from a 457 or 403(b) Deferred Compensation Plan"; and (2) "If you pay for your <u>Previous Service</u> through payroll deductions, those deductions are subject to Federal, State, and local income taxes." However, to the extent that those sentences are relevant, they focus narrowly on the taxation of payroll withholdings and do not overcome the broader and more pertinent language in the brochure which states explicitly that "There is no tax advantage to buying-back time."

Moreover, from a legal standpoint it is long settled that employee contributions to a pension plan are not deductible under section 162 (business expenses), section 212 (expenses for the production of income), or any other section of the Code. <u>Miller v. Commissioner</u>, 144 F.2d 287 (4th Cir. 1944), affg. <u>Taylor v. Commissioner</u>, 2 T.C. 267 (1943); <u>Sims v. Commissioner</u>, 72 T.C. 996, 1005 (1979); <u>Davidson v. Commissioner</u>, 42 T.C. 766, 769 (1964).

The courts have held that two main reasons explain why employee contributions are not deductible. First, one can view an employee's contributions to a pension plan as a capital contribution that the employee recovers without tax after he or she begins to receive the pension benefit. Sims v. Commissioner, supra at 1005. Secondly, if the contributions are an expense, then they are a nondeductible section 262 payment for personal, living, or family expenses. Id.

For all the foregoing reasons, petitioner may not deduct his buy back payments.

E. Travel

Petitioner deducted travel expenses of $1,740 and $1,650 for 13- and 12-day stays in Israel in April through May 2003 and in February 2004, respectively. These expenses consisted of $975 and $767 for airfare, respectively, with the remainder for each year going to meals and incidentals which petitioner computed using a per diem rate of approximately $50 per day. Petitioner testified that during the 2003 trip he discussed fundraising with Rabbi Sarna and other leaders at Geula, and that during the 2004 trip he confronted Rabbi Sarna and engaged an Israeli law firm to try to collect payment from the contract. Because petitioner was not engaged in the trade or business of fundraising during 2003 or 2004, none of the travel expenses are deductible as section 162 business expenses. However, regarding the 2004 trip, we

discuss below whether the travel expenses are deductible under section 212.

Section 212 allows a deduction for travel expenses that taxpayers incur for the production or collection of income; however, section 274(d) requires substantiation before a deduction can be allowed. When a trip consists of personal and business activities the taxpayer may deduct the travel expenses only if the trip is related primarily to the business purpose, which is a facts and circumstances inquiry. Rudolph v. United States, 370 U.S. 269, 275-276 (1962). For travel outside the United States, section 274(c)(1) generally disallows a deduction for the portion of the expense that is not allocable to the income-producing activity. However, section 274(c)(2) provides an exception to section 274(c)(1) if the trip qualifies under one of two exceptions: (A) The trip does not exceed 1 week, or (B) the portion of the trip not attributable to the taxpayer's section 212 activities constitutes less than 25 percent of the total time of the stay. Hintze v. Commissioner, T.C. Memo. 2001-70.

Regarding petitioner's 2004 trip to Israel, we note that because he is an Orthodox rabbi, and because he studied for and received his ordination in Israel, he had religious and personal reasons for visiting there. Out of his 12 days in Israel, we give petitioner the benefit of the doubt and estimate that he

spent 3 days (25 percent of his stay) discussing the 1990 contract with Rabbi Sarna and with the Israeli law firm. Because 3 out of 12 days is well less than 75 percent of the time he stayed in the country, petitioner's 2004 trip was primarily personal, and therefore, he may not deduct his airfare.

However, under section 274(c)(1) the portion of his expenses allocable to his section 212 activities may be deductible. Sec. 274(c)(2). The Commissioner, under authority of section 274(d), issues annual revenue procedures that rely on monthly rates published by the U.S. Department of State, Bureau of Administration, to allow a combined per diem meal and incidental rate for Jerusalem, Israel, of $84 per day for April and May 2003, as well as $84 per day for February 2004. Johnson v. Commissioner, 115 T.C. 210, 217 (2000); sec. 1.274-5(j), Income Tax Regs.; Rev. Proc. 2002-63, 2002-2 C.B. 691 (for the 2003 trip); Rev. Proc. 2003-80, 2003-2 C.B. 1037 (for the 2004 trip). Consequently, petitioner is entitled to a 2004 deduction for meals and incidental expenses of $252 ($84 x 3 days), subject to the 50-percent limitation on meals and entertainment that section 274(n) imposes, and subject to 2-percent floor that section 67(a) imposes on section 212 expenses. See Johnson v. Commissioner, supra at 215.

F.  Co-Op Apartment Maintenance Fees, Newspaper and Magazine
    Subscriptions, and Telephone Expenses

On Schedules C for 2003, 2004, and 2005 petitioner deducted
$9,544, $9,544, and $10,470, respectively, for co-op maintenance
fees on his Upper West Side co-op apartment.  Likewise,
petitioner deducted $1,483 and $652 on Schedules C for telephone
service at the co-op apartment for 2003 and 2005, respectively.
Petitioner also deducted $340 on Schedule C for 2003 for a
subscription to the New York Times newspaper, and briefly, to New
York Magazine.  Petitioner testified that on occasion, he met
with potential donors at the apartment, Rabbi Sarna on occasion
stayed there, about 80 percent of the telephone usage was for
fundraising, and he read the newspaper for fundraising leads.

Section 262(a) disallows a deduction for personal, living,
or family expenses.  The taxpayer bears the burden of proving
that an expense was for a business or income-producing purpose
rather than for personal reasons.  Walliser v. Commissioner, 72
T.C. 433, 437 (1979).  For an expense to be deductible, the
taxpayer must show that he incurred the expense primarily to
benefit his business, and the expense must have had a proximate
rather than a remote or incidental relationship to the taxpayer's
business.  Id.

Specifically, the purchase of general circulation newspapers
is a personal expense that taxpayers may not deduct.  Stemkowski
v. Commissioner, 690 F.2d 40 (2d Cir. 1982), affg. in part and

revg. in part 76 T.C. 252 (1981). As to the telephone expenses, petitioner moved into the co-op apartment in October 2005. Because petitioner has not substantiated the pre-residential income-producing use, the claimed deduction must be disallowed under section 262(a). Further, once the apartment became petitioner's residence near the end of 2005 the telephone expenses would become subject to section 262(b), which disallows a deduction with respect to the first telephone line to a taxpayer's residence.

Moreover, as we have previously discussed, petitioner was not conducting fundraising during 2003 through 2005 with sufficient continuity and regularity to qualify his expenses as deductible section 162 trade or business expenses on Schedules C. Further, petitioner has not shown how these expenses are proximately and not incidentally related to his attempts to collect payment from the contract.

For all the foregoing reasons, petitioner may not deduct the apartment maintenance fees, telephone charges, or newspaper subscriptions.

## Conclusion

To reflect our disposition of the issues,

Decision will be entered under Rule 155.